495 A.2d 517

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**David McGRATH, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 7, 1984.

Decided July 9, 1985.

252

Stanford Shmukler, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Gaele McLaughlin Barthold, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This is a reargument of *Commonwealth v. McGrath*, 504 Pa. 103, 470 A.2d 487 (1983). In that case we held that David McGrath's inculpatory statement to his superior officer, a Marine Corps Captain, was inadmissible at McGrath's trial for murder, aggravated assault, and criminal conspiracy in Philadelphia, due to the failure of the Captain to give the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). On May 14, 1984, we granted reargument. For the reasons stated herein we again hold that McGrath's inculpatory statements should have been suppressed in his trial for murder in Philadelphia.

The facts underlying this appeal are as follows. On July 6, 1979, McGrath and a companion were apprehended by police after an automobile chase through the streets of Philadelphia. They were suspects in two separate shootings which had occurred at 3:47 a.m. and 6:45 a.m. on that day. The shootings involved the random selection and shooting of three black male pedestrians, of which one was killed and two were wounded by bullets fired from one or

more large caliber handguns. McGrath and a companion were taken into police custody shortly after 7:00 a.m. on the morning of the shootings after having been chased, lost, sighted and chased again by several police vehicles. Both men were released later the same day as there was insufficient evidence at that time to charge them with a crime.

Subsequently, McGrath enlisted in the United States Marine Corps. While he was undergoing basic training at Paris Island, South Carolina, on September 5, 1979, the Philadelphia police contacted Major Beavers of the Marine Corps at Paris Island and informed him that they had a warrant for the arrest of McGrath for homicide and other charges. The Philadelphia police and Major Beavers agreed that the warrant would be transmitted to the Buford County Sheriff's Department which would arrest McGrath and hold him in the county jail until Philadelphia police arrived.

As a result of the discussions between Marine Corps personnel and the Philadelphia Police, McGrath was ordered to report to his Series Commander, Lieutenant Macintyre (a "Series" consists of 245 to 296 recruits.) According to the testimony of McGrath, the person who gave him this order, Drill Instructor Sergeant McLearned, also informed him that he was wanted in Philadelphia for having "killed somebody or shot people," and that he would have to meet with his Series Commander, his Company Commander, and the legal department, and that he would then go to jail.

McGrath reported to Lieutenant Macintyre whose testimony was introduced at the suppression hearing by stipulation, as follows: that on the basis of correspondence he had received from the Legal Division on the base at Paris Island, he had interviewed Private McGrath and had advised him that he, Lieutenant Macintyre, had been contacted by the Legal Division concerning a fraudulent enlistment and that the specifics were that McGrath was wanted in Philadelphia on the basis of an outstanding warrant charging him with homicide and several other charges.

Immediately following this interview, McGrath was taken to the office of Captain Walter Gaskin, the Company Com-

manding Officer. (A Marine Corps "Company" consists of five "series"; thus Captain Gaskin commanded approximately 1300–1500 recruits.) Captain Gaskin testified that he ordered McGrath to report to his office in response to receipt of a memorandum from the battalion Legal Division concerning McGrath's "possible fraudulent enlistment." The memorandum mentioned a police record, but did not mention an outstanding warrant, and, accordingly, at the time he interviewed McGrath, he knew nothing of the warrant or the homicide charges against McGrath, even though Lieutenant Macintyre and other Marine Corps personnel did know of the warrant and the charges. The reason given for this discrepancy was that, being McGrath's immediate superior officer, Lieutenant Macintyre received more detailed information from the Legal Division.

At the interview, which Captain Gaskins thought concerned a routine fraudulent enlistment matter of which he would have to make a recommendation to the Battalion Commander as to whether McGrath should be retained in the Marine Corps or discharged, the Captain asked McGrath the following:

Q. Private McGrath you're in here because its been indicated via the Battalion legal office that you're some type of fraudulent enlistment. It can be of any variety of reasons. Could have past police record or it could be of child support or any number of matters or reasons why there is a fraudulent enlistment. I am here to help you out and of course refer my recommendation to the Battalion Commander concerning retention.

At this time I said you can tell me what it is about that you know of and maybe something you failed to tell the recruiter at the time of enlistment and if you want to, then I can help you based on the information you give me—some advice and what tell the Battalion Commander concerning retention. Notes of Testimony of Suppression Hearing (N.T.S.H.) 533.

The Captain did not give McGrath either the *Miranda* warnings or warnings under Article 31(b) of the Uniform

Code of Military Justice, 10 U.S.C. § 831,[1] *both* of which are required by military law.

In response to the Captain's questions, McGrath implicated himself in the Philadelphia shootings. The Captain and others present at the interview testified at McGrath's criminal trial concerning his inculpatory statements.

Captain Gaskin further testified that when McGrath first made his inculpatory statement, a Lieutenant Dykhuizen was present. After McGrath told his story, the essence of which was that he was present at the shootings but had not pulled the trigger, the Captain called in the Chief Drill Instructor, Master Sergeant Jones, and McGrath then repeated his story three or four times. The Captain, who found the story "phenomenal," stated: "I was concerned about what he had said and I asked him to say it again and then I would ask him specific parts about it. [He repeated] the actual whole story maybe twice but different parts of it three or four times." N.T.S.H. 543.

The Captain also testified that when McGrath entered his office pursuant to his order, McGrath stood at attention and could not speak unless spoken to. Other testimony indicated that at a later stage of the interview, McGrath stood "at ease" while repeating his statement. Although the Captain testified that when he gives an order, he expects to

---

1. Art. 31. Compulsory self-incrimination prohibited

a) No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

b) *No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.*

c) No person subject to this chapter may compel any person to make a statement or produce evidence before any military tribunal if the statement or evidence is not material to the issue and may tend to degrade him.

d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

be obeyed, he also testified that McGrath should have known that he did not have to answer the Captain's questions under the Uniform Code of Military Justice: "He can refuse. As a matter of fact, in this time I had no reason to offer him rights but I asked him if he wanted me to help him. He could have voluntarily explained to me what had occurred. If he'd have said he didn't, I'd have said very well." N.T.S.H. 547.

Captain Gaskin indicated that when McGrath left his office, under supervision by drill instructors, he was taken to a holding center to await transfer to the custody of civilian authorities (the Buford County Sheriff's Department). There were no specific orders given to McGrath at that time restricting his freedom of movement, but none were necessary because "from the time a recruit arrives until the time he leaves Paris Island he's under constant supervision. So there was someone with him at all times anyway." N.T.S.H. 557. The Captain also testified that he learned of the Philadelphia arrest warrants only after completing the interview with McGrath and that the memo concerning "possible fraudulent enlistment" had, in fact, been a "mistake." That is, the Captain later became aware that McGrath's matter was "not a fraudulent enlistment case at all but a warrant." N.T.S.H. 563.

McGrath's testimony was consistent with that of the Marine Corps witnesses. McGrath testified that after his initial encounter with the first drill instructor, at which time he was told that he was going to jail in Philadelphia because of a shooting, he was interviewed by Lieutenant Macintyre and two or three other drill instructors. One of the drill instructors read the charges to him and Lieutenant Macintyre questioned him about the charges. He was then taken to pack all of his belongings and was told that he was being sent to Philadelphia. Within two hours of being interviewed by the Lieutenant, after packing his belongings, McGrath was interviewed by Captain Gaskin. With respect to this interview, McGrath was asked at the suppression hearing, "Were you aware that you had the alternative of

not to explain these things to him?" McGrath answered: "No I didn't. I didn't understand it, you know, I had a right to say no to an officer." N.T.S.H. 575. McGrath also testified he believed that if he did not tell the Captain about the shooting incident he would go to jail for not obeying an order. When it was pointed out that Captain Gaskin's words were not an order, McGrath replied:

Well, as a Private, anything an officer says to you, it's—I consider it—I considered an order at the time. I have no social life, you know, with the officers or anything. So like, what they say to me is his word or is law to me on that island. N.T.S. H. 580.

Thus, the issue in this case is whether, under the circumstances surrounding McGrath's questioning, the admitted absence of *Miranda* warnings prior to his interview by his Commanding Officer precludes the admission at the criminal proceeding in the Court of Common Pleas of Philadelphia County, of inculpatory statements elicited in that interview.

Subsequent to the first argument of this case, Mr. Justice Larsen authored the Opinion Announcing the Judgment of the Court and was joined by Mr. Chief Justice Roberts in holding that McGrath's inculpatory statement was inadmissible in the Philadelphia criminal trial because of the failure to give *Miranda* warnings. Mr. Justice Zappala concurred in the result, agreeing that *Miranda* is applicable, and stating that in addition to being a custodial interrogation, Military Officers are the equivalent of law enforcement officers under the Uniform Code of Military Justice, and therefore were required to warn McGrath of his constitutional rights under either *Miranda* or the Uniform Code of Military Justice. Mr. Justice Hutchinson also concurred, stating that although he believed McGrath was not in actual custody under the "totality of the circumstances," nevertheless the court, as a matter of comity, should recognize the Uniform Code of Military Justice and the decisions of the military courts interpreting that Act as persuasive authority with respect to the warnings required. Mr. Justice Flaher-

ty also concurred in the result, but viewed the military relationships between a subordinate and superior officer in the armed services to be *sui generis,* and would limit the case to its facts. Mr. Justice Nix (presently Chief Justice) dissented, and was joined by Mr. Justice McDermott in concluding that McGrath was not in actual custody and that his superior officer was neither a law enforcement official nor acting as an agent of law enforcement officials.

Our conclusion on reargument is that McGrath was the subject of a custodial interrogation by law enforcement officials, and that the inculpatory statements made to his commanding officer were inadmissible as having been received in violation of his constitutional rights.

The privilege against self-incrimination contained in the Fifth Amendment to the United States Constitution is: "No person ... shall be compelled in any criminal case to be a witness against himself." In *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the United States Supreme Court held that the Fourteenth Amendment makes the Fifth Amendment privilege against self-incrimination applicable to the States, and when applying the privilege against self-incrimination, the same constitutional standards apply regardless of whether it is a federal or state proceeding. The Court further held that this privilege has two facets: the government may not use compulsion to elicit self-incriminating statements, and the Government may not permit the use, in a criminal trial, of self-incriminating statements elicited by compulsion. *Murphy v. Waterfront Commission of New York,* 378 U.S. 52, 57 n.6, 84 S.Ct. 1594, 1598, 12 L.Ed.2d 678 (1964).

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court, in order to safeguard this Fifth Amendment privilege, held that a person in custody, prior to any questioning, must be clearly informed that he has the right to remain silent and that anything he says will be used against him in court; he must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during

questioning; and that, if he is indigent, a lawyer will be appointed to represent him.

Following the United States Supreme Court's lead, the United States Court of Military Appeals,[2] in *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), held that the principles enunciated by the Supreme Court in *Miranda* are fully applicable to military interrogations of criminal suspects, thus expanding the Fifth Amendment rights of military personnel beyond Article 31(b) warnings. As the Court in *Tempia* stated:

> *Miranda v. Arizona,* supra., explicitly and at length lays down concrete rules which are to govern all criminal interrogations by Federal or State authorities, military or civilian, if resulting statements are to be used in trials commencing on and after June 13, 1966.

That the Court of Military Appeals fully adopted the *Miranda* decision is further evidenced by its following statement:

> We commend a reading of that opinion [*Miranda v. Arizona*] to all involved in the administration of military criminal law as well as the undertaking of educative measures to see that its precepts are not violated in pretrial interrogations.... (*Id.* 384 U.S. at p. 444, 86 S.Ct. at p. 1612).

■ The initial impression of this court, expressed through the numerous opinions filed after our first consideration of this matter, apparently was that the military only had Article 31(b) warnings and that we would either have to apply Article 31(b) to a Pennsylvania criminal proceeding, or "stretch and strain" the *Miranda* rule in order to apply that rule to the military. This impression was erroneous. *Miranda* applies to the military in the same manner that it applies to all federal and state law enforcement officials.

2. The Court of Military Appeals is a civilian court created under Article 1 of the Constitution, consisting of three civilian judges, appointed by the President with the advice and consent of the Senate. See Article 67 U.C.M.J., 10 U.S.C. § 867. It is the highest appellate tribunal for military cases, and there is no further military appeal.

In our first opinion regarding this matter, the Opinion Announcing the Judgment of the Court stated:

"We are not here concerned with the failure of Captain Gaskin or other Marine Corps personnel to give the warnings required by the Uniform Code of Military Justice, Article 31(b). *See* note 2, *supra.* Article 31(b) would be relevant, perhaps dispositive, if we were reviewing a military proceeding. Since the instant proceeding is a civilian, criminal prosecution by a state sovereign, however, it is only *Miranda,* and federal and state precedent applying *Miranda* that governs the admissibility of McGrath's statements. *See United States v. Miller,* 261 F.Supp. 442 (D.Del.1966) (*McGrath,* 504 Pa. [at] 109, 110, 470 A.2d at 490 n.3."

The Court of Military Appeals has held that *both* Article 31(b) warnings and *Miranda* warnings must be given an accused. In fact, the accused in *Tempia* was given Article 31(b) warnings. The Court there held that these warnings were deficient as far as warning the accused of his right to counsel under the Sixth Amendment. As a result, the Court of Military Appeals holds that an accused must be advised of his *Miranda/Tempia* right to counsel and his Article 31(b) right to remain silent. *See United States v. Dohle,* 1 M.J.223 (C.M.A.1975).

Obviously, *Miranda* warnings contain both the right to remain silent and the right to counsel; thus the highest military court goes further in protecting this right than the United States Supreme Court by going beyond *Miranda* to require an additional warning. The Military Court of Appeals has held this to be so in *United States v. Dohle, supra.* Therefore, we are concerned only with the threshold question of whether McGrath received a *Miranda* warning at all. Thus, if McGrath had received a *Miranda* warning but not the Article 31(b) warning, under *United States v. Dohle* that would make his confession inadmissible in a court-martial. However, in a criminal trial in Pennsylvania the confession would be admissible since being advised in accordance with *Miranda* would meet our constitu-

tional standards as enunciated by this Court and United States Supreme Court.

This is what distinguishes *United States v. Newell*, 578 F.2d 827 (9th Cir.1978), the case relied on by the Commonwealth. In *Newell*, the Court of Appeals, Ninth Circuit, stated that "Newell concededly seeks application of the exclusionary rule to his statements not because they were taken in violation of his constitutional rights but because they were taken in violation of his right under military law and regulations to the assistance of counsel in court-martial proceedings."

▇▇▇ Under military law, once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code. *United States v. McOmber*, 24 C.M.A. 207, 209, 1 M.S. 380, 383 (1976). This is true even if counsel was only appointed in a related case and not the case under investigation. *See also, United States v. Lowry*, 25 C.M.A. 85, 2 M.J. 55 (1976).

The Court in *Newell* held that this went beyond the constitutional right to assistance of counsel as it was then interpreted in the Ninth Circuit. *Newell*, 578 F.2d at 833. Thus, Newell was not entitled to relief since his *constitutional* right to assistance of counsel had not been violated.

Applying the principles of the *Miranda* decision to the present case, we begin with the fact that, under the Uniform Code of Military Justice, McGrath's superior officers were law enforcement officers.

Article 9 of the Uniform Code of Military Justice 10 U.S.C. § 809 states:

809. Art. 9 Imposition of restraint

(a) Arrest is the restraint of a person by an order, not imposed as a punishment for an offense, directing him to remain within certain specified limits. Confinement is the physical restraint of a person.

(b) *An enlisted member may be ordered into arrest or confinement by any commissioned officer* by an order, oral or written, delivered in person or through other persons subject to this chapter. A commanding officer may authorize warrant officers, petty officers, or noncommissioned officers to order enlisted members of his command or subject to his authority into arrest or confinement.

(c) A commissioned officer, a warrant officer, or a civilian subject to this chapter or to trial thereunder may be ordered into arrest or confinement only by a commanding officer to whose authority he is subject, by an order, oral or written, delivered in person or by another commissioned officer. The authority to order such persons into arrest or confinement may not be delegated.

(d) No person may be ordered into arrest or confinement except for probable cause.

(e) Nothing in this article limits the authority of persons authorized to apprehend offenders to secure the custody of an alleged offender until proper authority may be notified. (Emphasis added).

 Thus, an officer may arrest an enlisted person any time he finds probable cause for such an arrest. Therefore, as far as Private McGrath was concerned, the Superior Officers who questioned him were law enforcement officers.

Furthermore, there can be no doubt that McGrath was in custody when questioned. As the Court of Military Appeals stated in *Tempia:*

The test to be applied is not whether the accused, technically, has been taken into custody, but, absent that, whether he has been "otherwise deprived of his freedom of action in any significant way." *Miranda,* supra, at page 444. Here, the accused was clearly summoned for interrogation. *Had he not obeyed, he would have undoubtedly subjected himself to being penalized for a failure to repair.* Code, supra, Article 86, 10 USC § 886; Manual for Courts-Martial, United States, 1951, para-

graph 127b. *In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action.* See *People v. Kelley*, 57 West's Cal.Rptr. 363, 424 P.2d 947 (1967). Hence, we conclude there was "custodial interrogation" in this case. (Emphasis added). 37 C.M.R. at 256.

See also *United States v. Shafer*, 384 F.Supp. 486, 489 (1974).

In *Commonwealth v. Chacko*, 500 Pa. 571, 577, 459 A.2d 311, 314 (1983), we held:

The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in *which he reasonably believes that his freedom of action or movement is restricted by such interrogation.*

■ Here, McGrath, who was ordered to report for questioning by his Commanding Officer, had to stand at attention before several of his superiors, speak only when spoken to, and was expected, as always, to obey their orders, was clearly in custody under either the *Tempia* or *Chacko* standard. Not only did he reasonably believe that he had to remain and answer his superior's questions, his freedom of action was *actually* restricted by his Commanding Officer's order to report. The degree of custody present here was certainly greater than that which existed in other cases we have decided involving a *Miranda* question.

In *Commonwealth v. Meyer*, 488 Pa. 297, 306–307, 412 A.2d 517, 521 (1980), we held that a custodial interrogation existed where the suspect was told by a state trooper "he would have to wait" at the scene of a traffic accident.

In *Commonwealth v. Chacko, id.* we held that a custodial interrogation existed where the suspect was a prisoner in

a correctional institution and was asked by a member of the prison staff if he was "involved in the stabbing incident" for which he was subsequently tried. There we made it clear that it is not the state of mind of the questioner that is a significant factor in determining whether a suspect has been the subject of a custodial interrogation, but the reasonable belief of the suspect. Here, it was reasonable for McGrath to believe that when he was ordered to report to his Commanding Officer and had to stand at attention for at least part of the interview, he could not leave without sanction. Additionally, when McGrath was told by at least two of his Superior Officers that he was wanted for murder in Philadelphia and that he would have to report to his Commanding Officer, it was reasonable for him to believe that he would be questioned about the charges by his Commanding Officer. *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

Thus, at the very least, under the "reasonable belief" of the suspect test, McGrath was clearly in custody when the inculpatory statement was elicited.

Captain Gaskin testified that he was questioning McGrath on a "routine" fraudulent enlistment matter so he could "make recommendations" to the Base Commander. In actuality, fraudulent enlistment is a court-martial offense. The Manual for Court-Martial, 1984, states in pertinent part:

### Part IV. Punitive Articles

7. Article 83—Fraudulent enlistment appointment, or separation

Any person who . . .

(1) Procures his own enlistment or appointment in the armed forces by knowingly false representation or deliberate concealment as to his qualifications for that enlistment or appointment and receives pay or allowances thereunder . . . shall be punished as a court-martial may direct.

(e) *Maximum punishment.*

Fraudulent enlistment or appointment. Dishonorable discharge, *forfeiture of all pay and allowances, and confinement for two (2) years.* (Emphasis added).

It is clear that any statements stemming from his interrogation that McGrath made concerning a fraudulent enlistment or any other military offenses would have been inadmissible in a court-martial against him because of the failure of his Commanding Officer to read him *Miranda/Tempia* rights. In *United States v. Dohle*, 1 M.S. 223 (C.M.A.1975) the Court of Military Appeals held that:

... where a person subject to the code interrogates— questions—or requests a statement from an accused or suspect over whom the questioner has some position of authority of which the accused or suspect is aware, the accused or suspect must be advised in accordance with Article 31.

This holding was later refined by the Court of Military Appeals in *United States v. Duga*, 10 M.S. 206 (C.M.A. 1981), which formulated two pre-requisites before Article 31(b) and *Miranda* will apply:

(1) whether a questioner subject to the code was acting in an official capacity in his inquiry or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation.

Clearly, under either standard, McGrath should have received a *Miranda/Tempia* warning. He was ordered to report to his Commanding Officer to answer questions regarding an official investigation. Captain Gaskin testified that he was acting in an official capacity. As to McGrath's own perceptions, he felt compelled to answer.

Since McGrath was the subject of a custodial interrogation by his Commanding Officer who is a law enforcement officer under the Code of Military Justice and as such is required to give a suspect *Miranda* warnings, this case is

no different than the case of an F.B.I. Agent or a Department of Treasury Agent, for example, eliciting a confession taken in violation of *Miranda* and a criminal court in Pennsylvania attempting to use it. *See, e.g., Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). This was exactly the practice that the United States Supreme Court ended in *Murphy v. Waterfront Commission of New York, supra.*[3] Our analysis need go no further. McGrath's Fifth Amendment rights were violated not only by the military when his confession was compelled, but his Fifth and Fourteenth Amendment rights were violated when a Pennsylvania criminal court permitted use of that confession against him.

Our grant of reargument was partly directed at what impact, if any, the Supreme Court's recent decision in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), has on the present case. We find that it has none.

The facts of *Murphy* are clearly distinguishable. In 1980, Murphy had been sentenced to probation, the terms of which required that he participate in a treatment program for sexual offenders, that he report to his probation officer as directed, and that he be truthful with the probation officer "in all matters." Failure to comply with these conditions, he was informed, could result in his return to the sentencing court for a probation revocation hearing.

**3.** "The constitutional privilege against self-incrimination has two primary interrelated facets: The Government may not use compulsion to elicit self-incriminating statements, see, e.g. *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892); and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion. See, e.g., *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). In every "whipsaw" case either the "compelling" government or the "using" government is a State, and, until today, the States were not deemed fully bound by the privilege against self-incrimination. Now that both governments are fully bound by the privilege, the conceptual difficulty of pinpointing the alleged violation of the privilege on "compulsion" or "use" need no longer concern us." 378 U.S. 52 at 57 n. 6, 84 S.Ct. 1594 at 1598, n. 6, 12 L.Ed.2d 678 at 683, n. 6.

In 1981, a counselor at the treatment center informed the probation officer that Murphy had admitted to a rape and murder which had taken place seven years previously. The probation officer decided to inform the police, but before doing so notified Murphy to contact her to discuss a treatment plan for the remainder of his probationary period. The probation officer opened the meeting by telling Murphy about the information she had received and expressing her belief that this information demonstrated his continued need for treatment. During this meeting, Murphy denied some of the charges, but admitted the rape and murder.

At the conclusion of the meeting, the probation officer told Murphy that she had a duty to relay the information to the authorities and encouraged him to turn himself in. However, she permitted him to leave her office. Two days later he called her to say that a lawyer advised him not to surrender to the police. The probation officer then obtained a detainer from the sentencing judge, and Murphy was later indicted for murder of the first degree.

Murphy moved to suppress testimony concerning his confession on the ground that it was obtained in violation of the Fifth and Fourteenth Amendments. The Supreme Court held that Murphy was not in custody for *Miranda* purposes since there was no restriction on his freedom of movement, noting that:

> Neither the trial court nor the Minnesota Supreme Court found that Murphy believed that his probation could have been revoked for leaving the meeting or that he remained in the office for this reason. Since the meeting was scheduled at a mutually convenient time and was arranged pursuant to a request that did not include any threat, it is unlikely that Murphy believed that terminating the meeting would have jeopardized his probationary status.

■ In the present case, not only did McGrath believe that he had to report to his Commanding Officer and answer questions, in reality he would have subjected him-

self to a possible court-martial for failure to obey the order to report.

Clearly, Private McGrath was in custody and questioned by law enforcement officers, and entitled to *Miranda* warnings which were not given, and therefore his confession should have been suppressed as taken in violation of his Fifth Amendment right against self incrimination.

The judgment of sentence is reversed and the case is ordered remanded for a new trial consistent with this opinion.

FLAHERTY, J., files a concurring opinion.

NIX, C.J., files a dissenting opinion, in which McDERMOTT, J., joins.

FLAHERTY, Justice, concurring.

As the majority has shown, the marine officer who interrogated McGrath had the status of a law enforcement officer and the interrogation was conducted under circumstances which were custodial in nature. For these reasons, I concur with the majority view that *Miranda* warnings were required and that in the absence of such warnings, McGrath's incriminating statement should have been suppressed.*

NIX, C.J., dissenting.

I remain of the view previously expressed in my earlier dissent in this matter. *Commonwealth v. McGrath*, 504 Pa. 103, 122–123, 470 A.2d 487, 497 (1983) (Nix, J., dissenting, joined by McDermott, J.).

McDERMOTT, J., joins in this dissenting opinion.

* The majority's discussion of military judicial decisions extending *Miranda* to a military setting is unnecessary, for where a law enforcement officer conducts a custodial interrogation, *Miranda* applies.