STATE OF NORTH CAROLINA v. ROBERT ANTHONY DAVIS

No. COA02-401

(Filed 20 May 2003)

## 1. Confessions and Incriminating Statements— statements by Marine to Platoon Commander—Miranda warnings

Statements made by a Marine to his Platoon Commander without Miranda warnings were inadmissible as the product of a custodial interrogation, but admission of the statements was harmless in light of other testimony. Under the totality of the circumstances, including the rules and regulations governing the military, a reasonable person in defendant's circumstances would have believed that he effectively had no freedom of movement.

## 2. Kidnapping— first-degree—removal—fraudulent representations

The trial court properly denied defendant's motion to dismiss a first-degree kidnapping charge, and consequently a felony murder charge, where the State presented evidence that defendant obtained consent from the victim by falsely telling the victim that he was stranded and needed a ride; defendant confessed that he had tricked the victim into giving him a ride; the victim had been following his routine, which would have taken him to his home; and the shooting did not occur on the way to the victim's home. The jury could infer that the scene of the shooting was not a place to which the victim would normally have gone

1

willingly absent defendant's fraudulent representations, and the State is not required to exclude all other possible inferences to defeat a motion to dismiss.

**3. Constitutional Law— effective assistance of counsel—factual issues—motion for appropriate relief**

An assignment of error alleging ineffective assistance of counsel was dismissed without prejudice to a subsequent motion for appropriate relief where there were factual issues to be more fully developed before a proper review of the claim could be undertaken.

**4. Homicide— first-degree murder—short-form indictment**

The trial court did not err by denying a motion to dismiss a first-degree murder charge which was based on a short-form murder indictment.

Judge BRYANT concurring in the result.

Appeal by defendant from judgments entered 1 June 2001 by Judge Donald M. Jacobs in Wayne County Superior Court. Heard in the Court of Appeals 28 January 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*Paul M. Green for defendant-appellant.*

GEER, Judge.

Defendant Robert Anthony Davis appeals from judgments filed 1 June 2001 entered consistent with jury verdicts finding him guilty of first-degree murder and first-degree kidnapping. The issues before this Court are: (I) whether defendant's statements to his Platoon Commander, Chief Warrant Officer Brown, were the product of a custodial interrogation and/or not voluntarily given; (II) whether there was sufficient evidence that defendant kidnapped the victim through use of fraud or misrepresentation; (III) whether the record is sufficient to determine if defendant received ineffective assistance of counsel at trial; and (IV) whether the trial court erred in not dismissing the short-form indictment or forcing the State to elect one theory of first-degree murder. We find no prejudicial error in defendant's trial, but dismiss defendant's ineffective assistance of counsel assign-

ment of error without prejudice to its being asserted in a later motion for appropriate relief.

---

The State's evidence tends to show that in February 1999, defendant was serving in the United States Marine Corps and stationed at Twenty-Nine Palms in California. Prior to returning to North Carolina on leave, defendant showed Anthony Knight, a member of his platoon, a Taurus 9mm handgun that he had purchased. Knight and defendant then made targets to practice shooting in the desert surrounding Twenty-Nine Palms. Three days before going on leave, defendant told Knight and several other people that he "was going to beat the crap out of a guy for raping his wife."

While defendant was on leave in Goldsboro, North Carolina, he and his wife went to the bakery where the ultimate victim, Milton Williams, worked. Defendant asked to speak to Sheila Small, his first cousin, but when Small came out, defendant asked her to get James Foster, who also worked at the bakery. Defendant told Foster that he wanted to see Williams. When Foster asked why, defendant said that Williams had raped defendant's wife. Defendant announced to Foster that he was going to "kick [Williams'] ass." Defendant asked Foster to tell Williams that Foster had seen defendant. In later conversations with Foster, defendant also talked about beating up Williams.

At one point during the following days, defendant and Foster asked Small to call Williams and pretend to arrange a meeting with him at which defendant would appear instead. Small, however, refused.

On 11 March 1999, Williams left work at the bakery between 3:30 and 4:00 a.m. As he did every day, he gave Robert Reddick a ride home from work. Usually, when Williams left work, he would continue home to his trailer after dropping off Reddick. Williams was supposed to pick Reddick up at 7:30 a.m. that same morning to get their paychecks.

At about 5:30 a.m., Williams entered a Pantry convenience store in Goldsboro. A second man walked in shortly after Williams, the two men talked a bit, and then they left together. These events were captured by the store's security camera.

Sometime after Douglas Macklin got up at 5:20 a.m., he heard ten gunshots. He looked out of his window in the Edwards Mobile Home Park and saw a car moving slowly towards his home with a second

car following behind. Macklin then saw a person fall into the street beside the first car, get up, and jump into the second car, which drove away. Wayne County Sheriff's deputies and emergency medical technicians arrived at the scene and found Williams' dead body inside the car in the driver's seat. Teresa Watkins, the victim's sister, confirmed that the Edwards Mobile Home Park was not on a direct route between the Pantry convenience store and the victim's home, but rather required turning in the opposite direction at a particular intersection.

Williams had been shot numerous times at close range from the passenger side of the car. A number of 9mm Federal brand bullet cartridge cases—all fired from the same gun—were found around the crime scene. This brand of bullets was available at the same store where defendant had purchased the 9mm Taurus handgun.

Later on the day of the shooting, Foster, who was at Sheila Small's house, was paged by defendant. Defendant reported vaguely to Foster: "I had to do that." It was not until 30 or 45 minutes later that Foster learned that something had happened to Williams.

Foster and Small went to defendant's parents' house, where defendant had been staying. Small went inside, but Foster spoke with defendant in the yard. Foster asked defendant what had happened, and defendant stated, "he did what he had to do." When Small came back outside, she asked defendant: "Did you do it?" Defendant again said that he did what he felt like he had to do. Defendant asked Small to keep the information to herself and she agreed.

Later that day, Small talked again with defendant and his wife. Defendant explained that he got a ride from Williams at a store and had his wife follow them:

> [Davis] told me that he met [Williams] at a store. He asked him for a ride. Said he was stranded. I don't know if he asked him where he was going or whatever, but he wound up in the car with him, said he would give him a ride. They was heading wherever they wound up at. He said that [Williams knew] . . . that he was being followed and he said he was like, "What?" And he said that [Williams] leaned down, reached down as if he was going to get something from under his seat, he didn't know what, and he shot him. He jumped out of the car, he said.

Defendant's wife then suggested that it was good that they had not reported the rape since that "would have led right back to them."

**STATE v. DAVIS**

[158 N.C. App. 1 (2003)]

Rodney Atkinson, also defendant's first cousin, testified that he too asked defendant whether he had killed Williams. Although at first, defendant said no, he then broke down and said, "Yeah, I done it." Later, defendant explained to Atkinson in greater detail that while defendant was riding with Williams, defendant's wife had pulled up beside Williams' car and defendant asked whether Williams knew who she was. When Williams reached under his seat, "everything just happened," according to defendant.

On 24 March 1999, after returning to California, defendant asked his sergeant, Howard Crosby, if he knew how to dispose of a 9mm handgun. Sergeant Crosby offered to buy the gun, but a few minutes later, defendant stated that he could not sell the gun because he had already dismantled it and thrown it away in the desert. Later that same day, defendant took a phone call. When he returned, he told Crosby that he needed to telephone a lawyer. Crosby asked him why, but defendant refused to talk about it. Crosby took defendant to see his Platoon Sergeant, Lieutenant Scott Cavenaugh, because Cavenaugh had authority to give defendant permission to leave his station to make a telephone call.

After speaking to Cavenaugh, defendant was escorted by both Cavenaugh and Crosby to see Chief Warrant Officer Kenneth Lee Brown, the Platoon Commander. Cavenaugh told Brown that defendant had received a phone call indicating that the sheriff's department was on the way to arrest him and that Brown would want to hear what defendant had to say. Defendant confirmed to Brown that his mother had called and warned that a detective from North Carolina was on the way because defendant was a suspect in a murder case. Brown asked defendant if he was involved in the murder and defendant replied "sort of." Brown then said: "Well, are you involved or not involved? Yes or no question." Defendant replied, "Yes, I am involved." He explained that he did not know the murdered man, but that he had been told that the man raped his wife in North Carolina while defendant was in California. Defendant was then allowed to make his telephone call.

I

[1] Defendant argues first that his statements to Chief Warrant Officer Brown, defendant's Platoon Commander, were the product of a custodial interrogation. Because, prior to making these statements, defendant was not given his *Miranda* warnings, we hold that

these statements were inadmissible. We conclude, however, that any error in admitting the statements was harmless beyond a reasonable doubt.

### The Importance of the Military Context of the Interrogation

In deciding whether the Platoon Commander's questioning of defendant constituted a custodial interrogation, we must consider the realities and necessities of military life. We cannot disregard the military context. The United States Supreme Court "has long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743, 41 L. Ed. 2d 439, 450 (1974). Requiring a member of the armed forces to choose either to disregard a direct question of a commanding officer or forego his or her Fifth Amendment rights, will risk undermining the discipline and order that is the necessary hallmark of our military. Those members of the armed forces who commendably act in accordance with their training should not, for their reward, be punished by being stripped of their Fifth Amendment rights.

Although the Court in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), recognized that the Fifth Amendment prohibits the use only of "compelled" testimony, it concluded that custodial interrogations are so inherently compelling that an individual is entitled to be warned in advance of his or her rights. The critical holding of *Miranda* is that " ' "custodial situations" create[] a presumption of compulsion which would exclude statements of a defendant' " if unwarned. *State v. Buchanan*, 353 N.C. 332, 336-37, 543 S.E.2d 823, 826 (2001) (quoting *Oregon v. Elstad*, 470 U.S. 298, 306-07, 84 L. Ed. 2d 222, 230-31 (1985)). Concerns about inherent compulsion are ultimately at the heart of *Miranda*. In the military, interrogation by a superior officer raises a substantial risk of inherent compulsion.

The United States Supreme Court has observed that the " '[military's] law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier.' " *Parker*, 417 U.S. at 744, 41 L. Ed. 2d at 451 (quoting *In re Grimley*, 137 U.S. 147, 153, 34 L. Ed. 636, 11 S. Ct. 54 (1890)). Indeed, the military can only function with "strict discipline and regulation that would be unacceptable in a civilian setting." *Chappell v. Wallace*, 462 U.S. 296, 300, 76 L. Ed. 2d 586, 590 (1983).

A superior officer must be assured that a soldier will react immediately and without question to a command on the battlefield. That

instinctive reaction has to be instilled in a soldier long before he goes to war: "The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Id.* at 300, 76 L. Ed. 2d at 590-91. *See also Goldman v. Weinberger,* 475 U.S. 503, 507, 89 L. Ed. 2d 478, 484 (1986) (emphasis added) ("[T]o accomplish its mission the military must foster *instinctive* obedience, unity, commitment, and esprit de corps").

The relationship between the superior officer and those under his command is key:

The Court has often noted "the peculiar and special relationship of the soldier to his superiors," and has acknowledged that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty. . . ." This becomes imperative in combat, but conduct in combat inevitably reflects the training that precedes combat; for that reason, centuries of experience has developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns.

*Chappell,* 462 U.S. at 300, 76 L. Ed. 2d at 591 (citations omitted).

The United States Court of Appeals for the Armed Forces has recognized that the unique environment of the military must be taken into account when determining, under *Miranda,* the admissibility of statements made to commanding officers. In *United States v. Swift,* 53 M.J. 439, 445 (2000), *cert. denied,* 531 U.S. 1150, 148 L. Ed. 2d 966 (2001), the court stated: "In the armed forces, a person learns from the outset of recruit training to respond promptly to the direct orders and the indirect expectations of superiors and others, such as military police, who are authorized to obtain official information. Failure to respond to direct orders can result in criminal offenses unknown in civilian life. . . ."

Thus, under 10 U.S.C. §§ 889 and 890, a man or woman in the service "shall be punished" by court-martial for behaving with disrespect toward his superior commissioned officer or for willfully disobeying a lawful command of his superior commissioned officer. 10 U.S.C. §§ 889, 890 (2003). As a result of these criminal provisions and the training instilled in members of our armed forces from the earli-

est point of service, "a question from a superior or an investigator is likely to trigger a direct response without any consideration of the privilege against self-incrimination." *Swift*, 53 M.J. at 445.

Because of this possibility, Congress—fifteen years before *Miranda*—passed legislation, codified at 10 U.S.C. § 831 (2003), containing a warning requirement almost identical to *Miranda. Swift*, 53 M.J. at 445. While it is not entirely clear why Congress required warnings in the military long before civilians were entitled to such protections, "it may be assumed that Congress believed that in the military, warnings were essential to the effective exercise of the right against self-incrimination. Pressures of rank and duty position are not a problem in civilian law enforcement activities." M. Supervielle, *Article 31(b): Who Should be Required to Give Warnings?*, 123 Mil. L. Rev. 151, 186 (Winter 1989).

The Supreme Court has stressed that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, *and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment." Burns v. Wilson*, 346 U.S. 137, 140, 97 L. Ed. 1508, 1514 (1953) (emphasis added). Only Congress has the authority to decide how to balance the rights of men and women in the service with the needs of the armed forces: "The Framers expressly entrusted that task to Congress." *Id.*

Yet, if civilian courts may hold—contrary to military law—that unwarned questioning by superior officers is not custodial interrogation and does not violate *Miranda* in the civilian courts, then that balance will be substantially disrupted. Although a member of the armed forces should not be encouraged to debate whether or not to answer his superior's question, a rule making his responses admissible would effectively mandate that he do so. On the other hand, a man or woman in the service who acts instinctively and answers automatically—as he or she has been trained—can hardly be considered to have acted voluntarily to the same extent as a civilian. We do not believe that this unsettling of the balance struck by Congress is wise or consistent with the mandate of the United States Supreme Court: "Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment." *Chappell*, 462 U.S. at 300, 76 L. Ed. 2d at 591.

STATE v. DAVIS

[158 N.C. App. 1 (2003)]

Custodial Interrogation Under *Miranda*

In deciding whether defendant Davis was subjected to a custodial interrogation, the trial court was required to determine whether defendant's statements were the result of " 'questioning initiated by law enforcement officers after [defendant had] been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Gaines*, 345 N.C. 647, 661-62, 483 S.E.2d 396, 405 (quoting *State v. Phipps*, 331 N.C. 427, 441, 418 S.E.2d 178, 185 (1992)), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). The court applies an objective test: "whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." *Buchanan*, 353 N.C. at 339-40, 543 S.E.2d at 828. In other words, the question in this case is whether a reasonable Marine in the circumstances confronting defendant Davis would have believed that his freedom of movement was limited to the same degree as a formal arrest.

a.

The first question arising in this appeal is whether defendant Davis was subjected to questioning by a law enforcement officer. In concluding that he was not, the trial court overlooked the Uniform Code of Military Justice. That Code, at 10 U.S.C. § 809 (2003) (emphasis added), provides:

(a) Arrest is the restraint of a person by an order, not imposed as a punishment for an offense, directing him to remain within certain specified limits. Confinement is the physical restraint of a person.

(b) *An enlisted member may be ordered into arrest or confinement by any commissioned officer by an order, oral or written, delivered in person or through other persons subject to this chapter* [10 USCS §§ 801 et seq.]. . . .

In short, Brown—who was both a commissioned officer and Platoon Commander—had authority to order the arrest of defendant.[1]

---

1. Although Brown testified that he could not arrest an individual, it is apparent from his testimony that he was referring to the ability to perform a physical arrest, a power lodged in the Military Police, and was not addressing his authority under the Code of Military Justice to order a person's arrest or confinement. Brown did admit that he had authority to force defendant to remain in one place until Brown chose to release him.

Brown's authority to order that someone be placed under arrest is sufficient to invoke the protections of *Miranda*. *See Commonwealth v. McGrath*, 508 Pa. 250, 262-63, 495 A.2d 517, 523 (1985) (finding that the defendant's superior officers were law enforcement officers within the meaning of *Miranda* based on the fact that they had the ability to order defendant into arrest). *See also Swift*, 53 M.J. at 445 ("Another special feature of military life is the blending of both administrative and law enforcement roles in the performance of official duties."); M. Supervielle, *Article 31(b)*, 123 Mil. L. Rev. at 187 ("Military leaders often perform law enforcement functions as part of their duties.") Indeed, the hybrid nature of military superior officers was one of the reasons Congress needed to require warnings long before police officers were required to give them to civilians. M. Supervielle, *Article 31(b)*, 123 Mil. L. Rev. at 205 ("Only by requiring warnings could Congress be assured that a suspect would be put on notice that a military superior asking him questions did so in a law enforcement capacity, and not in a personal capacity or in one of his many other official, non-law enforcement capacities.").

b.

The second question for this appeal is whether defendant Davis, when being questioned, was in custody within the meaning of *Miranda*. The trial court should have considered what a reasonable Marine in defendant's position, under the totality of the circumstances, would have believed. A court may make this determination only by reviewing the expectations governing Marines. As explained above, a reasonable Marine would have believed that he was required to answer the questions of his commanding officer and that he was not free to leave until he had done so. This reality was in fact born out by the evidence.

Here, defendant Davis did not voluntarily subject himself to questioning by his commanding officer. *See United States v. Tempia*, 16 C.M.A. 629, 636 (1967) ("It ignores the realities of [military life] to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action."). The trial testimony reveals that defendant informed his immediate supervisor Crosby that he needed to call a lawyer. Crosby escorted defendant to the Platoon Sergeant, Lieutenant Scott Cavenaugh, because Cavenaugh had the authority to authorize defendant's requested phone call. Cavenaugh and Crosby then escorted defendant to Platoon Commander Brown. There is no evidence in the record that de-

fendant was escorted to see Brown for any reason other than to inform Brown that a Marine under his command was a murder suspect. On *voir dire*, Brown testified that Cavenaugh told him that he might want to hear what defendant had to say about events that had happened while defendant was on leave. Cavenaugh then told Brown that defendant had received a phone call stating that a member of the Wayne County Sheriff's Department was on the way to arrest defendant. According to Brown, Cavenaugh was obligated to report such information to his commanding officer, Platoon Commander Brown.

As Brown repeatedly testified, defendant Davis could not, while he was being questioned, leave Brown's office without Brown's permission. In fact, Brown specifically stated that Davis was not allowed to leave his office until Brown had obtained the information that he needed to make a report to his own commanding officers.

Brown testified that he asked defendant whether he was involved in the murder to which defendant replied, "Sort of." Brown asked what defendant meant and defendant replied that he did not want to go into details. Brown then asked, "Well, are you involved or not involved? Yes or no question"—a question that sounds remarkably like an order. Defendant replied that he was involved. Only after Brown received the information he wanted from defendant did Brown "let him go." Even so, when the sheriff's deputies arrived at the base, the Marine Corps already had defendant in custody.

This is precisely the type of inherent compulsion that *Miranda* was designed to address, as other civilian courts have found. In *United States v. Shafer*, 384 F. Supp. 486, 489 (N.D. Ohio 1974), the court reasoned that for military personnel, custody does not require the same level of restraint as would be required for civilians. The *Shafer* court added that " 'interrogation' takes on a far different meaning in a military environment, where any superior officer has the right to demand that his questions be answered." *Id.* The court, therefore, held that handwritten statements made in response to a request by military superiors were inadmissible. *Id.* at 490.

Under circumstances parallel to those here, the Pennsylvania Supreme Court likewise found that when a defendant was ordered to report to his commanding officer for questioning and was required to remain and answer his superior's questions, he was "clearly in custody . . . ." *McGrath*, 508 Pa. at 264, 495 A.2d at 524. As a result, "his confession should have been suppressed as taken in violation of his

Fifth Amendment right against self incrimination." *Id.* at 269, 495 A.2d at 526. We reach the same conclusion in this case.

Brown was effectively functioning as a law enforcement officer at the time that defendant's statements were elicited. Under the totality of the circumstances surrounding Brown's questioning—including the rules and regulations governing the military—a reasonable person in defendant's circumstances would have believed that he was required to answer Brown's questions and that he effectively had no freedom of movement. We, therefore, conclude that a custodial interrogation occurred and that defendant's statements to Brown should not have been admitted into evidence.

The Harmlessness of the Error

Nevertheless, we find that the admission of defendant's statement to Brown—that defendant was "sort of" involved and that the victim had raped defendant's wife—was harmless beyond a reasonable doubt. *See* N.C. Gen. Stat. § 15A-1443(b) (2001). Apart from the statement to Brown, the jury heard testimony from other Marines that defendant was showing off a gun of the type used to kill Williams, that he intended while on leave to assault the man who had raped his wife, and that, when he returned from leave, he needed to and did dispose of his handgun.

Other witnesses, including Foster and two of defendant's first cousins, likewise testified that defendant wanted physical revenge on Williams for raping his wife. They further testified that defendant had confessed to them in great specificity about having shot Williams, with details that were consistent with the actual facts observed by other witnesses. Because the information received from Brown was duplicative of extensive other testimony, we hold that this error was harmless beyond a reasonable doubt.

II

[2] Defendant next contends that the trial court should have granted his motion to dismiss the first-degree kidnapping charge and consequently also the felony murder charge based on first-degree kidnapping. A motion to dismiss should be denied if "there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense." *State v. Lynch*, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). "Substantial evidence is that relevant evidence which a reasonable mind would find sufficient to support a conclusion." *State v. Carr*, 122 N.C. App. 369,

372, 470 S.E.2d 70, 72 (1996). In determining whether there is evidence sufficient for a case to go to the jury, the trial court must consider the evidence, both direct and circumstantial, in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence. *Id.*

In order to obtain a conviction for first-degree kidnapping, the State was required to present substantial evidence that defendant unlawfully confined, restrained, or removed the victim Williams from one place to another without the victim's consent for the purpose of doing serious bodily harm to the victim and that the victim was in fact seriously injured. *See* N.C. Gen. Stat. § 14-39 (2001). Defendant contends only that there was insufficient evidence of the victim's lack of consent to his confinement, restraint, or removal.

Under N.C. Gen. Stat. § 14-39, " 'where false and fraudulent representations or fraud amounting substantially to a coercion of the will of the kidnapped person are used as a substitute for force in effecting kidnapping, there is, in truth and in law, no consent at all on the part of the victim.' " *State v. Jackson*, 309 N.C. 26, 40, 305 S.E.2d 703, 714 (1983) (quoting *State v. Gough*, 257 N.C. 348, 356, 126 S.E.2d 118, 124 (1962)). The State must prove, however, that the fraud or trickery directly induced the victim to be removed to a place other than where the victim intended to be. *State v. Sexton*, 336 N.C. 321, 365, 444 S.E.2d 879, 904 (defendant's lie to victim caused her to drive down nearby road rather than return home), *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994); *State v. Sturdivant*, 304 N.C. 293, 306-07, 283 S.E.2d 719, 729 (1981) (defendant's "chicanery" caused victim to be in deserted rural location in North Carolina rather than at her home in South Carolina).

Here, the State presented substantial evidence that defendant obtained consent from the victim by falsely telling the victim that he was stranded and needed a ride. Defendant confessed he had tricked the victim into giving him a ride and that defendant's wife was following behind. Prior to defendant's approaching him in the convenience store, the victim Williams had been following his routine, based on Robert Reddick's testimony, of dropping off Reddick on his way home from the bakery after work. The evidence also indicated that typically Williams would then continue on to his own home. The scene of the shooting was not, however, on the way to the victim's home, but was in fact in a different direction. From this evidence, the jury could infer that the scene of the shooting was not a place to

which the victim would normally have gone willingly absent defendant's fraudulent representations.

Similarly, in *State v. Cobb*, 150 N.C. App. 31, 41-42, 563 S.E.2d 600, 608, *disc. review denied*, 356 N.C. 169, 568 S.E.2d 618 (2002), this Court held that a motion to dismiss a first-degree kidnapping charge was properly denied when the evidence showed that the victim left his home with the intention of traveling to Raleigh, that the victim stopped at a rest area as was his habit, and that his body was found two miles away on a road not within his course of travel. This Court concluded: "From this evidence, it is reasonable for a jury to infer the victim had been forced to abandon his plan to drive to Raleigh and drive to the location where his body was found." *Id.* at 41, 563 S.E.2d at 608. The evidence in this case is at least equal to that in *Cobb*.

While defendant points to alternative inferences that the jury could draw, the State is not required to exclude all other possible inferences in order to defeat a motion to dismiss. "In considering a motion to dismiss, the evidence must be considered in the light most favorable to the state, and the state is entitled to every reasonable inference to be drawn therefrom." *Jackson*, 309 N.C. at 40, 305 S.E.2d at 714.[2] Accordingly, the trial court's denial of the motion to dismiss was proper.

III

[3] Defendant next contends he received ineffective assistance of counsel because his trial attorneys had lost all credibility with the jury by promising in the opening statement evidence of numerous facts and theories that counsel was later unable to support with admissible evidence, by presenting evidence in conflict with the forecast of the evidence given in defendant's opening statement, and through emotional outbursts in reaction to the trial court's rulings. In addition, defendant points to an anonymous letter that the trial court read into the record following the sentencing hearing, which expressed concern that one of defendant's attorneys suffered from a substance abuse problem and referenced the attorney's volatile outbursts during the trial. The trial court did not conduct any hearing to

---

2. In *Jackson*, the Supreme Court found insufficient evidence of kidnapping when the evidence showed only that defendant entered the victim's car for purposes of robbery and there was no evidence at all to suggest where the victim was going or that he ended up somewhere other than along his intended course of travel. 309 N.C. at 41, 305 S.E.2d at 714.

determine whether defendant's attorney had been impaired during defendant's trial and no further action was taken on the matter.

"Attorney conduct that falls below an objective standard of reasonableness and prejudices the defense denies the defendant the right to effective assistance of counsel. An IAC claim must establish both that the professional assistance defendant received was unreasonable and that the trial would have had a different outcome in the absence of such assistance." *State v. Fair*, 354 N.C. 131, 167, 557 S.E.2d 500, 525 (2001) (citations omitted), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). Ineffective assistance of counsel claims are usually raised in post-conviction proceedings and not on direct appeal. Such claims may, however, be raised on direct appeal when the cold record reveals that no further factual development is necessary to resolve the issue. *Id.* at 166, 557 S.E.2d at 524. If the record reveals that factual issues must be developed, the proper course is for the appellate court to dismiss those assignments of error without prejudice to the defendant's right to raise an ineffective assistance of counsel claim in a later motion for appropriate relief. *State v. Long*, 354 N.C. 534, 539-40, 557 S.E.2d 89, 93 (2001).

In this case, our review of the record and the claims made by defendant reveals that there are in fact factual issues which must be more fully developed before a proper review of defendant's ineffective assistance of counsel claim may be undertaken. Accordingly, we do not address the merits of this claim and dismiss this assignment of error without prejudice to defendant's right to raise this issue in a subsequent motion for appropriate relief.

IV

[4] Defendant finally argues that the trial court erred under both the federal and North Carolina Constitutions by denying his motion to dismiss the first-degree murder charge based on a short-form indictment and his motion to compel the State to disclose the theory that the State would pursue to convict defendant of first-degree murder. Defendant raises these arguments to preserve them for possible future proceedings, but acknowledges that the North Carolina Supreme Court has previously rejected both of defendant's contentions. *See State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000) (approving short-form first-degree murder indictment), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Clark*, 325 N.C. 677, 684, 386 S.E.2d 191, 195 (1989) (holding that the State is not required to make an election regarding first-degree murder

theory). Accordingly, we overrule defendant's assignments of error on these issues.

No error.

Judge WYNN concurs.

Judge BRYANT concurs in result only with separate opinion.

BRYANT, Judge, concurring in the result.

I fully concur in the result reached by the majority that there was no error in defendant's trial. However, I write separately as I conclude defendant's statements to Chief Warrant Officer Brown were not the product of a custodial interrogation and therefore the admission of those statements was not error, rather than harmless error.

A

The majority first states public policy mandates that, in order to uphold military discipline and order, members of the armed forces should never be forced to choose between either disregarding a direct question from a superior officer or subjecting themselves to self-incrimination in a later criminal trial. Under the majority's analysis, however, a superior officer would be required to give Miranda warnings and/or Article 31(b) warnings before asking any question under any circumstances of someone under his or her command out of concern that the response might possibly be incriminating. In so doing, the majority is creating what amounts to a limited "soldier-commanding officer" privilege, whereby no statement given by a member of the armed forces to a commanding officer would be admissible in a civilian court absent Miranda warnings. This ignores the reality that military officers perform many different roles: they are not always disciplinarians. The better rule is that a superior officer need only give the appropriate warnings to someone under his command that he suspects has committed an offense and when the questioning is for disciplinary purposes, and not merely administrative reasons. In fact, this is the exact rule adopted by military law. *See United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991) (a member of armed forces is entitled to warnings only if he is a suspect at the time of the questioning and the questioning itself is part of an official law-enforcement investigation or disciplinary inquiry); *see also United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000) (proper warnings

STATE v. DAVIS

[158 N.C. App. 1 (2003)]

must be given to members of the armed forces before questioning about an offense where there is no evidence to overcome the presumption that questioning is law enforcement related and not solely for administrative reasons).[3]

B

I also disagree with the majority's conclusion under civilian law that a reasonable person in defendant's position would have believed he was under arrest or was restrained in his movement to the degree associated with a formal arrest.

The evidence in this case reveals that defendant, after having received a telephone call, voluntarily requested permission to leave his station. As a result of this request, defendant was ultimately escorted to Chief Warrant Officer Brown. Lieutenant Cavenaugh stated defendant had something that Brown might want to hear. Before this meeting, Chief Warrant Officer Brown had no prior knowledge of the crime and only learned of it when defendant told him that there had been a murder in North Carolina, which led to Chief Warrant Officer Brown asking defendant if he was involved. Defendant eventually responded he was "involved," and at that point the questioning ceased. As he had requested, defendant was then given permission to leave his work station to telephone a lawyer. No arrest order was given and Chief Warrant Officer Brown was neither acting as a member of military law enforcement, nor did he assert his rank to force or threaten defendant to answer any questions.[4]

Every indication from this record is that defendant was not being questioned for disciplinary purposes. Instead, defendant was questioned because it was Chief Warrant Officer Brown's administrative duty as a platoon commander to be aware of potential legal troubles of the men under his command and, in this particular instance,

---

3. The majority also cautions against altering the balance between the needs of the armed forces and the rights of their members. Yet, in ignoring the rule already set by military courts, by forcing an officer to hesitate and debate whether to even ask a simple question of those under his command, the majority does precisely that. Nevertheless, this case actually presents the reverse question: to what extent should military practices alter the balance between the needs of the prosecution and the rights of a criminal defendant in a civilian court.

4. The arrest warrant for defendant was not issued until 26 March 1999, two days after defendant's statements to Chief Warrant Officer Brown, and defendant was not arrested until 8 April 1999. Thus, the fact defendant was in Marine "custody" at the time of his arrest by Wayne County sheriff's deputies is not relevant to any analysis of whether he was in custody at the time he gave the statements.

to determine whether defendant should be permitted to leave his station. There is no evidence to support a contention that defendant's statement was anything other than the product of his voluntarily seeking permission to leave his station in order to telephone a lawyer.

The majority also asserts that defendant was subjected to custodial interrogation because Chief Warrant Officer Brown was defendant's commanding officer and had the authority to order an arrest. Here again, this would have the effect of requiring a superior officer to give Miranda and Article 31(b) warnings before asking any question of a service member under his command. Even if the questioning could be said to have occurred in a coercive environment, it does not automatically convert this non-custodial situation into one in which *Miranda* applies. *See State v. Buchanan*, 353 N.C. 332, 337, 483 S.E.2d 823, 826-27 (2001); *see also Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977) (voluntary appearance at police station). Instead, the correct test to be uniformly applied is "whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." *Buchanan*, 353 N.C. at 339-40, 543 S.E.2d at 828.

The trial court in this case found that defendant "received a telephone call . . . at his work location . . . and told [his sergeant] that he needed to go home." The trial court also found "defendant voluntarily went with the officer . . . to . . . Brown's office" and "[Chief Warrant] Officer Brown was not a military policeman . . . did not have the authority to arrest and was not functioning as a police officer in any respect." As to Chief Warrant Officer Brown's questioning of defendant, the trial court found, "at all times while . . . defendant was in . . . Brown's presence he could refuse to answer any questions . . . and he could walk out of the office at any time." The trial court further found, "at one point at the end of the conversation . . . defendant said he didn't want to talk anymore and at that point [Chief Warrant Officer] Brown asked no further questions" and "defendant was never told that he had to answer any questions, was not threatened in any way, coerced in any way and from his conduct . . . appeared to be in the possession of his mental and physical faculties." These findings are supported by the evidence presented by the parties during *voir dire* and are thus conclusive on appeal. *See Buchanan*, 353 N.C. at 336, 483 S.E.2d at 826.

On these facts, a person voluntarily requesting to leave his station would not reasonably have believed that he was under arrest or that his freedom of movement was being restrained to the same degree as that of a formal arrest.[5] Defendant's statement was, therefore, not the product of a custodial interrogation, and thus, defendant was not entitled to Miranda warnings prior to questioning for administrative purposes by his superior officer. Accordingly, I conclude it was not error to admit defendant's statement to Chief Warrant Officer Brown.

---

5. As the majority acknowledges, military law provides explicit definitions as to what it means to be under arrest or ordered into confinement, neither of which occurred in this case.