DAVIS, Judge.
 

 *468
 
 In this case, we reexamine the circumstances under which
 
 Miranda
 
 warnings are required when a member of the armed forces is questioned by his superior officer about his involvement in the commission of a crime. Defendant Sebastian Gamez entered an
 
 Alford
 
 plea to the charges of second-degree murder, aiding and abetting a first-degree kidnapping, and conspiracy to commit kidnapping, but his plea was conditioned on his right to appeal the trial court's denial of his motion to suppress certain oral and written inculpatory statements made by him to a superior officer. Because we conclude that the trial court's order denying his motion to suppress lacked findings of fact on key issues and the court did not fully apply the correct legal standard in ruling on Defendant's motion, we vacate the order in part and remand for further proceedings.
 

 Factual and Procedural Background
 

 On 25 March 2013, Defendant, then a private in the United States Army stationed at
 
 *906
 
 Fort Bragg, was indicted by a grand jury on charges of murder, concealing the death of a person, first-degree kidnapping, and conspiracy to commit first-degree kidnapping. On 2 June 2016, Defendant filed a motion to suppress four items of inculpatory evidence: (1) statements he made to detectives at the Harnett County Sheriff's Office on 16 August 2011; (2) statements made to detectives at the Cumberland County Sheriff's Office on 17 August 2011; (3) an oral statement made to Sergeant Rebecca Schlegelmilch on 18 August 2011; and (4) written statements contained in a letter sent by him from jail to Sergeant Schlegelmilch dated 2 September 2011.
 

 A hearing was held on Defendant's motion to suppress on 5 December 2016 in Harnett County Superior Court before the Honorable C. Winston Gilchrist. On 10 March 2017, the trial court entered an order (the "Suppression Order") denying Defendant's motion in its entirety. In the Suppression Order, the trial court made the following pertinent findings of fact:
 

 1. On August 16, 2011 Rebecca Schlegelmilch was a first sergeant in 3
 
 rd
 
 brigade of the United States Army stationed at Fort Bragg, North Carolina. She was then, and at all times material herein a non-commissioned officer.
 

 2. On August 16, 2011 Christopher Blackett and Sebastian Gamez were privates in her company. Blackett was her driver and Gamez was in the distribution platoon as a truck driver.
 

 *469
 
 3. During this time, Lavern Sellers was a sergeant also in Schlegelmilch's company.
 

 4. The primary duties of the first sergeant are to look after the health and welfare of the soldiers under her. These included training and professional development. While at times these also include some investigations of criminal conduct by soldiers, that is not a specific duty but is based on a case by case basis.
 

 5. At no time material herein was Schlegelmilch conducting an investigation into the death of Vincent Carlisle or the involvement of Blackett and Gamez. In fact, the military as a whole was not investigating this as a criminal matter.
 

 6. On August 16, 2011 Sellers contacted Schlegelmilch after Blackett told him that Blackett had shot somebody. Upon learning that information Schlegelmilch had Sellers call Blackett so they could meet. When Blackett showed up at company headquarters Schlegelmilch asked him what had happened.
 

 7. At first Blackett did not want to tell her anything because he did not want to involve Schlegelmilch. However, after Schlegelmilch told him that she needed to know what happened he told her that somebody broke into his and Gamez's house and that the two of them tried to capture the individual. When they did that, the individual pulled a gun on Gamez and Blackett shot that individual. He also said that he and Gamez then took the individual into the woods. He said that he was not sure if the individual was alive or dead.
 

 8. Initially Schlegelmilch was not sure if this had even happened, whether the individual was alive or dead, or where this might have happened. Blackett agreed to take her and Sellers on highway 210 in the direction he said he and Gamez went in an attempt to locate where the body was left.
 

 9. After driving some time, Schlegelmilch began Googling "police station" or something similar on her phone to locate the nearest law enforcement center. At that time, they were near the Harnett County Sheriff's Office (hereinafter
 
 *470
 
 HCSO or HC) so she directed Sellers to that location. Once there she recommended to Blackett that he tell the police what was going on, but if he didn't, she would have to. She was concerned that there might [be] a threat against one of her soldiers or that the individual shot might need help.
 

 10. During the drive, she called Gamez to ask him what happened in an attempt to confirm the information Blackett was giving her. Gamez's response was that he did
 
 *907
 
 not know what she was asking. He said he had no knowledge of what she was talking about. She did not ask him any direct questions about what Blackett had told her.
 

 11. Once at the Sheriff's office, she asked if they could talk to someone who could help and Blackett, Sellers and she were placed in a room. Once an officer came in the room, Blackett started telling the officer why they were there. The officer left and some detectives arrived. Blackett went to a different area of the sheriff's office while Schlegelmilch and Sellers remained in the hallway.
 

 12. While Blackett was with the detectives Schlegelmilch called her commander (Captain Lett) to inform her of the situation. Also, at some point during the interview Schlegelmilch stepped outside the Sheriff's office to smoke and called Lett to ask her to get a hold of Gamez and have him go [to] the Sheriff's office so he could be interviewed. A detective or officer overheard her and pulled her aside. That officer told her that she couldn't "tell these people to come up here or make people come up here. If they want to they can." She then called back to the company and talked to the NCO taking Gamez to the Harnett County Sheriff's Office and told him that they couldn't make Gamez go to the Sheriff's office and he didn't have to go there if he didn't want to. However, Gamez was already on his way.
 

 13. Upon receiving the call from Schlegelmilch that the detectives wanted to talk to Gamez, Captain Lett informed her battalion Commander, Lt. Col[.] Baumeister, and command Sergeant Major Hall, of the situation. Captain Lett was told to bring Gamez to the company headquarters. She left headquarters and went to the firing range to get Gamez. She told Gamez to get back to the headquarters without
 
 *471
 
 explaining to him the reasons for his return. Driving back to headquarters, Gamez did not ask any questions and was not asked any by Captain Lett or anyone else.
 

 14. Lt. Bobby Reyes with the Cumberland County Sheriff's Office (hereinafter CCSO or CC) received information from Nan Trogden [sic] of the CCSO that she had received a call from Harnett County Sheriff's Office that they had a soldier there who was telling them about a shooting homicide, possibly in Cumberland County. He then contacted Lt. Webb of the HCSO to confirm the information. Reyes and Sgt. Brown then went to the Harnett County Sheriff's Office. Reyes also dispatched Sgt. Gagnon and Sgt. Trogdon to 102 Carmichael Street in Spring Lake, the location where the shooting was alleged to have occurred.
 

 15. Upon arriving at the HCSO Reyes and Brown were briefed by Lt. Webb. They were advised that a person, later identified as Vincent Carlisle, had broken into Blackett's and Gamez's residence days earlier and that on Sunday evening he broke in again. There was a scuffle in the living room. Mr. Carlisle ran out the back door and was chased by Blackett. Gamez ran out the front door to cut Carlisle off. Blackett said that Carlisle then pulled a gun on Gamez and Blackett shot Carlisle several times. After that the two soldiers got trash bags, wrapped up Carlisle's body, put it in the back of Gamez's Hummer and drove to Harnett County where they disposed of the body. The information also was that they had thrown the victim's gun into the Cape Fear River and that Blackett's gun was disassembled and stored inside Blackett's vehicle on Ft. Bragg.
 

 16. When Reyes and Brown arrived at the HCSO, Blackett was not there but was with a HC deputy, Schlegelmilch and Sellers travelling the roads looking for the location where the body might have been left. Gamez was also not at the HCSO but was on the way. Reyes contacted other deputies with Cumberland County and had them go to Fort Bragg in order to retrieve the weapon from Blackett, which he agreed to give them.
 

 17. When Gamez arrived at the HCSO Schlegelmilch told him, "I can't make you be here, so you don't have to talk or do anything." His response to her was "okay"
 

 *908
 
 or "Yes, First
 
 *472
 
 Sergeant." Gamez then walked into the HCSO and went to the same area where Blackett had been to be interviewed. Gamez was directed into the interview room by Lt. Webb of the HCSO who thanked Gamez for being there. There he was interviewed by Reyes and Brown. Neither Reyes nor Brown had anything to do with Gamez appearing at the Sheriff's Office. Prior to being interviewed, Gamez was not given any Miranda rights [sic].
 

 18. Before, during and after the interview, Gamez was not handcuffed or restrained in anyway [sic]. He was not threatened at all. He was not promised anything. Except for the actual interview, detectives with Cumberland County had no prior contact with Gamez and did not ask him any questions. During the interview Gamez gave a statement that essentially mirrored that given by Blackett.
 

 19. At one point during the interview, Reyes told Gamez that they were going to take him in a car to look for Carlisle's body. To this, Gamez responded that he was not going to do that, that he did not have to do that, and that he was told he was at the Sheriff's Office only to give information. At that point, Reyes nor Brown pushed the issue further. Additionally, based on the information given during the interview, detectives were not sure whether Carlisle was hurt, alive or deceased. During the interview, Gamez never asked for an attorney, nor did he state that he did not want to answer any further questions. He was cooperative throughout.
 

 20. At the conclusion of the interview, Gamez was not arrested or further detained. He was allowed to leave the Sheriff's Office. Nether Reyes nor Brown was aware of who Gamez left with.
 

 21. After interviewing Gamez, Reyes and Brown then interviewed Blackett.
 

 22. At the conclusion of the interviews of Blackett and Gamez, Blackett told Schlegelmilch that he had the weapon involved in the shooting and was willing to give it to the Cumberland County detectives. Gamez was present at this conversation. Sellers, Schlegelmilch, Blackett and Gamez then left the HCSO in Seller[s'] vehicle and drove back to Fort Bragg. At no point was Gamez under
 
 *473
 
 any orders to cooperate with law enforcement or to give statements or information to them. Upon arriving at Fort Bragg, Blackett went to his car with Schlegelmilch, located the weapon used in the shooting, assembled it, [and] gave it to Schlegelmilch, who then gave it to an MP. Blackett then agreed to go to his residence and allow law enforcement to search his residence. Blackett, Schlegelmilch and Sellers then went to 102 Carmichael Drive, Spring Lake, the home of Blackett and Gamez.
 

 23. Shortly after they arrived, Detectives Gagnon and Trogdon of the Cumberland County Sheriff's Office left the residence to go to Fort Bragg to meet Gamez to obtain consent to search the Hummer and residence. Upon meeting with Gamez at Fort Bragg, he signed a consent to search the residence and his vehicle.
 

 24. Blackett, after giving law enforcement the weapon used in the shooting, arrived at the residence and signed a consent for the search of that home.
 

 25. As a part of the search of Gamez's Hummer, the officers desired to spray the inside with Blue Star reagent to detect the presence of blood. However, where the vehicle was initially parked there was too much lighting. Gamez drove his vehicle to another location on post where it was dark enough to use the reagent. Schlegelmilch went with him as a passenger.
 

 26. The Defendant's home was searched by Cumberland County officers. Schlegelmilch and Sellers remained outside the residence some distance away. During this search, law enforcement came to the conclusion that the incident could not have happened as it was described to them by Gamez and Blackett.
 

 27. After the search, law enforcement asked Blackett and Gamez if they would agree to go to the CCSO to be interviewed
 
 *909
 
 on August 17. They agreed and Cumberland County detectives arranged to contact Schlegelmilch about the time and place for this interview. At the least, Blackett specifically agreed that night to go to the August 17, 2011 interview and Gamez, being present when the question was posed, did not object in any way.
 
 *474
 
 28. Upon return to base, Blackett and Gamez had their liberty restricted to base and were not allowed to live at the Carmichael residence. Their sleeping location was restricted to the conference room at headquarters. While liberty restrictions were not unusual for soldiers, First Sgt. Schlegelmilch, had not been involved in a restriction of this type. However, this restriction was not for punishment, but for concern over the safety and welfare of the soldier, including fear of retaliation (the victim was the neighbor of the defendant), fear of reprisals and gossip among other soldiers, and safety of Gamez from harm to himself (he had already attempted suicide one previous time). Criminal investigation and general law enforcement were not considered as a part of this decision.
 

 29. On the 17
 
 th
 
 of August, Schlegelmilch received a call from CC detectives setting up an interview with Gamez and Blackett for that day.
 

 30. On the morning of the 17
 
 th
 
 Gamez went about his duties. At some point Gamez came to headquarters and Sellers, Schlegelmilch, Gamez and Blackett went to the CCSO in the same vehicle. At no time did Gamez object to going. He was under no compulsion to do so. Though escorted by Schlegelmilch and Sellers, neither had the authority to force Gamez to go to the Cumberland County Sheriff's Office or to give an interview.
 

 31. Upon arriving at the CCSO the four signed in. Sellers and Blackett went into one room and Schlegelmilch and Gamez went into another. Detective Gagnon joined Schlegelmilch and Gamez in that interview room.
 

 32. At no point was Schlegelmilch conducting any type of investigation. At no time did Gamez object to talking with law enforcement.
 

 33. Det. Gagnon conducted an interview with Gamez. In the room was Gagnon, Schlegelmilch, and Gamez. At the beginning of the interview Gagnon explained to Gamez that the military had different rules than civilians. She explained that she wanted to make sure Gamez was there because he wanted to be there and that he was not ordered to be at the Sheriff's Office, nor was he ordered to give an
 
 *475
 
 interview. She specifically asked Gamez if he wanted to be at the Sheriff's Office or whether he was ordered to be there. He replied that he wanted to be there and he was there on his own. He was asked if he wanted his first sergeant in the room during the interview and he said he did.
 

 34. At no time was Gamez restrained in any way. He was free to leave and not answer questions. His demeanor was cooperative. At no time did Schlegelmilch require him to answer any questions. At one point during the interview Reyes knocked on the interview room door and called for Schlegelmilch to leave the room out of concern that it would appear Gamez was being required to give the interview. After Gagnon explained to him that Gamez requested Schlegelmilch to be in the room Gagnon went back in the room and again asked Gamez, alone, about her presence. Gamez told Gagnon that he would not speak to Gagnon without Schlegelmilch being present.
 

 35. At the end of the interview, Gamez was released to go about his business and he left the CCSO.
 

 36. At no time did anyone associated with Harnett County law enforcement or Cumberland County law enforcement request that Gamez be detained prior to his actual arrest, and at no time did anyone associated with either agency request Schlegelmilch or others in the Army to elicit information from Gamez.
 

 37. During the day of August 18, 2011 officers with the Harnett County Sheriff's
 
 *910
 
 Office and the Cumberland County Sheriff's Office discovered the body of Vincent Carlisle in the woods off of Shady Grove Road in Harnett County. The location was discovered by using cell phone data from the phones of Blackett and Gamez pinpointing their location during the night of August 14, 2011.
 

 38. Based upon the location of the body and the fact that shell casings and projectiles were found near and under Carlisle's body, it became clear to law enforcement that the killing had occurred in Harnett County and that the version of events given to them by Blackett and Gamez was not the truth.
 

 *476
 
 39. At that point, a decision was made to arrest the defendant. This decision was not told to Schlegelmilch.
 

 40. Schlegelmilch first realized that Blackett had lied to her about what happened after Gamez's mother called her and informed her that Carlisle's body had been found. Upon receiving this information she went to the building where Gamez and Blackett had been placed and saw law enforcement from Harnett and Cumberland counties present at headquarters. At that point she pulled Gamez aside and told him that she knew Blackett had lied to her and she asked Gamez what happened. She did not do this at the direction of law enforcement.
 

 41. At that point Gamez told her that Gamez and Blackett had invited Carlisle over to their house to confront him about a break-in at their house. Once there, Gamez said they started beating and choking him. Gamez told her that it got out of hand and they took Carlisle to the woods. Gamez told her that he drove. While Blackett took Carlisle into the woods Gamez drove around. After a few minutes Blackett called him telling him to come back and get him. When Gamez picked Blackett up, Blackett told Gamez that Carlisle tried to get away and he shot Carlisle.
 

 42. After some time had passed, Schlegelmilch told this to Cumberland County detectives and later gave this statement to Harnett County law enforcement.
 

 43. Gamez and Blackett were arrested on August 18, 2011 and charged with the murder of Vincent Carlisle. They were placed in the Harnett County jail. Gamez was appointed an attorney.
 

 44. On August 18, 2011 Gamez was read his Fifth Amendment rights and did not waive them, nor did he give a statement to law enforcement.
 

 45. Separation proceedings from the Army were begun on Gamez on August 25, 2011. He was personally served with those papers at the Harnett County detention center by Captain Lett on August 31, 2011 and waived his rights to counsel and a hearing, and to propose any defense, and to contest the decision to discharge him.
 

 46. From the time Gamez was arrested, Schlegelmilch visited Gamez in the detention center, talked to him on the
 
 *477
 
 phone and the two wrote letters to each other. The letters were friendly in nature.
 

 47. On August 31, 2011 Schlegelmilch wrote a letter to Gamez while he was in the Harnett County detention center. At the end of the letter she inquired of Gamez what happened that night. She stated that "I really want to know why all this took place. Will you tell me the real reason this all happen[e]d? It can't be just over a break-in. I am going to try to go to your court date on the 6th, if I can."
 

 48. In response, Gamez wrote Schlegelmilch on September 2, 2011 acknowledging receipt of her letter and telling her that he would have his lawyer get the September 2
 
 nd
 
 letter to her. He went on to tell her that he and Blackett asked Carlisle to their house, he tried to run so they caught him, handcuffed him, beat him, threatened him, "bagged" him and ... drove him to the woods. Then Blackett took him into the woods and shot him while Gamez drove around.
 

 49. Gamez was under no compulsion to write this letter and did so on his own
 
 *911
 
 volition. This letter was not the result of any interrogation by law enforcement.
 

 Based on these findings, the trial court concluded that none of Defendant's statements were "the product of any custodial interrogation by law enforcement or the equivalent of law enforcement," that "[e]ach of the statements was freely and voluntarily given by the Defendant and [was] not coerced by anyone," and that the 2 September 2011 letter "was freely and voluntarily written by him and given to [Sergeant Schlegelmilch] .... not as a result of any interrogation by her or anyone else."
 

 On 6 February 2017, Defendant entered an
 
 Alford
 
 plea to the charges of second-degree murder, aiding and abetting a first-degree kidnapping, and conspiracy to commit kidnapping. As part of the plea arrangement, the State took a voluntary dismissal of the charge of concealing the death of a person and Defendant reserved his right to appeal the trial court's denial of his motion to suppress. Defendant gave timely notice of appeal to this Court.
 

 Analysis
 

 On appeal, Defendant contends that the trial court erred in denying his motion to suppress (1) the oral statement he made to Sergeant Schlegelmilch on 18 August 2011; and (2) the 2 September 2011 letter
 
 *478
 
 he sent her from jail.
 
 [1]
 
 He contends that the suppression of these statements to Sergeant Schlegelmilch was required because he did not receive
 
 Miranda
 
 warnings before making them despite the fact that the statements were made during custodial interrogation. In making this argument, he contends that based on prior decisions from this Court Sergeant Schlegelmilch effectively served as a law enforcement officer at the time the statements were given, thereby triggering his right to receive
 
 Miranda
 
 warnings. We address in turn his arguments as to each of these statements.
 

 I. 18 August Oral Statement
 

 "When a motion to suppress is denied, this Court employs a two-part standard of review on appeal: The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law."
 
 State v. Jackson
 
 ,
 
 368 N.C. 75
 
 , 78,
 
 772 S.E.2d 847
 
 , 849 (2015) (citation and quotation marks omitted). "Unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed de novo and are subject to full review."
 
 State v. Warren
 
 ,
 
 242 N.C. App. 496
 
 , 498,
 
 775 S.E.2d 362
 
 , 364 (2015) (internal citations and quotation marks omitted),
 
 aff'd per curiam
 
 ,
 
 368 N.C. 756
 
 ,
 
 782 S.E.2d 509
 
 (2016).
 

 It is well established that
 
 Miranda
 
 warnings are required to be given when a defendant is subjected to custodial interrogation.
 
 See, e.g.
 
 ,
 
 State v. Gaines
 
 ,
 
 345 N.C. 647
 
 , 661,
 
 483 S.E.2d 396
 
 , 404,
 
 cert. denied
 
 ,
 
 522 U.S. 900
 
 ,
 
 139 L.Ed. 2d 177
 
 (1997) ("[The North Carolina Supreme Court] has consistently held that the rule of
 
 Miranda
 
 applies only where a defendant is subjected to custodial interrogation."). This Court has previously explained the potential applicability of
 
 Miranda
 
 to members of the military being investigated for crimes under civilian law.
 

 In
 
 Miranda v. Arizona
 
 , the Supreme Court defined custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. When dealing with a defendant who is a member of the armed forces and whose statement is given to a superior officer, the inquiry becomes whether
 
 *479
 
 a reasonable Marine in [the defendant's] situation would believe his freedom of movement was limited to the same extent as if [he] were under formal arrest.
 

 State v. Walker
 
 ,
 
 167 N.C. App. 110
 
 , 123-24,
 
 605 S.E.2d 647
 
 , 657 (2004) (internal citations and quotation marks omitted),
 
 vacated in part on other grounds
 
 ,
 
 361 N.C. 160
 
 ,
 
 695 S.E.2d 750
 
 (2006).
 

 *912
 
 Our Supreme Court has explained that "[b]ecause
 
 Miranda
 
 is limited to custodial interrogations, statements made to private individuals unconnected with law enforcement are admissible so long as they were made freely and voluntarily."
 
 In re W.R.
 
 ,
 
 363 N.C. 244
 
 , 248,
 
 675 S.E.2d 342
 
 , 344 (2009) (citation and quotation marks omitted). Our courts have recognized exceptions to this general rule, however, where a private individual is "acting as an agent of law enforcement,"
 

 id.,
 

 or, in the military context, under certain circumstances where a member of the armed forces is subject to custodial interrogation by a superior officer,
 
 Walker
 
 ,
 
 167 N.C. App. at 124
 
 ,
 
 605 S.E.2d at 657
 
 .
 

 This Court has addressed the applicability of
 
 Miranda
 
 in the military context in two prior cases. First, in
 
 State v. Davis
 
 ,
 
 158 N.C. App. 1
 
 ,
 
 582 S.E.2d 289
 
 (2003), the defendant, who was a Marine, received a phone call warning him that deputy sheriffs were on the way to arrest him because he was a suspect in a murder. The defendant told his sergeant that he needed to talk to a lawyer. When his sergeant asked him why, he refused to answer. The defendant was escorted shortly thereafter to the office of his platoon commander, Chief Warrant Officer Kenneth Lee Brown.
 

 Id.
 

 After Brown was informed of the defendant's request, he asked the defendant "if he was involved in the murder and defendant replied 'sort of.' Brown then said: 'Well, are you involved or not involved? Yes or no question.' "
 

 Id.
 

 The defendant proceeded to admit that he was, in fact, involved and that he had been told that the victim had raped his wife.
 

 Id.
 

 On appeal, this Court addressed the issue of whether the statements made to Brown "were the product of a custodial interrogation" for purposes of
 
 Miranda
 
 .
 

 Id.
 

 We first considered the "military context" of the interrogation, stating the following:
 

 In deciding whether the Platoon Commander's questioning of defendant constituted a custodial interrogation, we must consider the realities and necessities of military life. We cannot disregard the military context. The United States Supreme Court has long recognized that the military is, by necessity, a specialized society separate from
 
 *480
 
 civilian society. Requiring a member of the armed forces to choose either to disregard a direct question of a commanding officer or forego his or her Fifth Amendment rights, will risk undermining the discipline and order that is the necessary hallmark of our military. Those members of the armed forces who commendably act in accordance with their training should not, for their reward, be punished by being stripped of their Fifth Amendment rights.
 

 ....
 

 The United States Supreme Court has observed that the military's law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier. Indeed, the military can only function with strict discipline and regulation that would be unacceptable in a civilian setting.
 

 A superior officer must be assured that a soldier will react immediately and without question to a command on the battlefield. That instinctive reaction has to be instilled in a soldier long before he goes to war: The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection.
 

 ....
 

 The United States Court of Appeals for the Armed Forces has recognized that the unique environment of the military must be taken into account when determining, under
 
 Miranda
 
 , the admissibility of statements made to commanding officers. [The Court has] stated: In the armed forces, a person learns from the outset of recruit training to respond promptly to the direct orders and the indirect expectations of superiors and others, such as military police, who are authorized to obtain official information. Failure to respond to direct orders
 
 *913
 
 can result in criminal offenses unknown in civilian life.
 

 ....
 

 The Supreme Court has stressed that the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the
 
 *481
 
 civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. Only Congress has the authority to decide how to balance the rights of men and women in the service with the needs of the armed forces: The Framers expressly entrusted that task to Congress.
 

 Yet, if civilian courts may hold ... that unwarned questioning by superior officers is not custodial interrogation and does not violate
 
 Miranda
 
 in the civilian courts, then that balance will be substantially disrupted. Although a member of the armed forces should not be encouraged to debate whether or not to answer his superior's question, a rule making his responses admissible would effectively mandate that he do so. On the other hand, a man or woman in the service who acts instinctively and answers automatically-as he or she has been trained-can hardly be considered to have acted voluntarily to the same extent as a civilian.
 

 Id.
 
 at 6-8,
 
 582 S.E.2d at 293-95
 
 (internal citations, quotation marks, ellipses, emphasis, and brackets omitted).
 

 We held that because Brown "was both a commissioned officer and Platoon Commander [and thus] had authority to order the arrest" of the defendant, he "was effectively functioning as a law enforcement officer at the time that defendant's statements were elicited."
 
 Id.
 
 at 9, 12,
 
 582 S.E.2d at 295, 296
 
 . We further ruled that for purposes of
 
 Miranda
 
 the defendant had been in custody while he was being questioned. With regard to this issue, we explained that the trial court "should have considered what a reasonable Marine in defendant's position, under the totality of the circumstances, would have believed. A court may make this determination only by reviewing the expectations governing Marines."
 
 Id.
 
 at 10,
 
 582 S.E.2d at 296
 
 .
 

 We observed that the defendant had not voluntarily subjected himself to questioning by Brown in that the defendant "could not, while he was being questioned, leave Brown's office without Brown's permission," and that Brown's question as to whether the defendant had been involved in the murder sounded "remarkably like an order."
 
 Id.
 
 at 10, 11,
 
 582 S.E.2d at 296
 
 . For these reasons, we concluded "that a custodial interrogation had occurred and that defendant's statements to Brown should not have been admitted into evidence."
 
 Id.
 
 at 12,
 
 582 S.E.2d at 297
 
 .
 

 *482
 
 We next applied these principles in
 
 State v. Walker
 
 . The defendant in
 
 Walker
 
 was a Marine who had been convicted of robbery with a dangerous weapon and assault with a deadly weapon inflicting serious injury. At trial, statements that the defendant made to his superior officer, Master Gunnery Sergeant Dean, were admitted into evidence. The defendant argued on appeal that because he had not been read his
 
 Miranda
 
 rights prior to giving these statements, the trial court should have excluded them.
 
 Walker
 
 ,
 
 167 N.C. App. at 117, 123
 
 ,
 
 605 S.E.2d at 651, 656-57
 
 . This Court "acknowledge[d] that interrogation by a superior officer in the military raises a significant risk of inherent compulsion, which is of the type
 
 Miranda
 
 was designed to prevent."
 
 Id.
 
 at 124,
 
 605 S.E.2d at 657
 
 (citation omitted). Nevertheless, we held that the record did "not indicate [that the defendant] was 'in custody' at the time he" made the statements at issue such that
 
 Miranda
 
 warnings were not required.
 

 Id.
 

 The record shows that ... Walker was questioned by First Sergeant Nylon, of the Naval Criminal Investigative Services, and Investigator Melton, and at each questioning he received
 
 Miranda
 
 warnings. Dean did not see Walker until the next day. Dean testified that when Walker came in the next morning "we started talking in my office, and basically he explained to me what the agent wanted." Dean then asked Walker if "he had anything to do with this
 
 *914
 
 mess" and whether he was carrying a weapon of any kind. Walker told Dean he was at [the nightclub] that night, but he had only gone to watch [another Marine's] back because [he] was having some kind of dispute with the owner's boyfriend. Walker also told Dean that he carried a baseball bat of some type and he remained outside watching the bouncers. There was no testimony that Walker felt he could not leave or that he had to answer Dean's questions. Instead, it appears that Dean was simply inquiring into why Walker was being questioned. Since Dean's questioning of Walker did not constitute a custodial interrogation, Dean was not required to administer
 
 Miranda
 
 warnings prior to their conversation.
 

 Id.
 

 (quotation marks and ellipses omitted).
 

 In the present appeal, Defendant argues that
 
 Davis
 
 is controlling because like the defendant in that case, he was interrogated by a superior officer - Sergeant Schlegelmilch - who had the power to arrest him. The State, conversely, contends that
 
 Davis
 
 applies only in situations
 
 *483
 
 where a soldier is questioned by a commissioned officer because only commissioned officers possess independent arrest authority.
 

 Federal law governs the power of arrest in the armed forces.
 
 10 U.S.C. § 809
 
 states, in pertinent part, as follows:
 

 (a) Arrest is the restraint of a person by an order, not imposed as a punishment for an offense, directing him to remain within certain specified limits. Confinement is the physical restraint of a person.
 

 (b) An enlisted member may be ordered into arrest or confinement by any commissioned officer by an order, oral or written, delivered in person or through other persons subject to this chapter.
 
 A commanding officer may authorize
 
 ...
 
 noncommissioned officers to order enlisted
 

 members of his command or subject to his authority into arrest or confinement.
 

 10 U.S.C. § 809
 
 (2012) (emphasis added).
 

 Thus, a commanding officer is authorized to delegate his or her arrest authority to a non-commissioned officer. In situations where this has occurred, the non-commissioned officer's interrogation of a soldier can trigger the need for
 
 Miranda
 
 warnings.
 
 [2]
 

 It is undisputed that Sergeant Schlegelmilch was a non-commissioned officer at all times relevant to this case. Therefore, in order to resolve the issue of whether Defendant was entitled to
 
 Miranda
 
 warnings when he made the 18 August oral statement to her, it is necessary to first determine whether Sergeant Schlegelmilch had previously been delegated authority to arrest Defendant by a commanding officer as authorized by
 
 10 U.S.C. § 809
 
 (b).
 

 Defendant has not challenged any of the trial court's findings of fact contained in its Suppression Order, and we are therefore required to accept them as binding on appeal.
 
 See
 

 Warren,
 

 242 N.C. App. at 498
 
 ,
 
 775 S.E.2d at 364
 
 (2015). However, although the trial court noted in its order that Sergeant Schlegelmilch was a non-commissioned officer, it did not make any findings of fact as to whether the authority to arrest Defendant had, in fact, been delegated to her. We note from our review of the transcript that at the suppression hearing Sergeant Schlegelmilch testified
 
 *484
 
 that earlier on the morning of 18 August she had placed Defendant and Blackett into separate rooms with a non-commissioned officer stationed in each room to make sure they did not leave. The trial court failed to make any findings, however, on the circumstances under which Sergeant Schlegelmilch took this action or who authorized her to do so. Such findings are central to the question of whether Sergeant Schlegelmilch should be deemed to have been acting as a law enforcement officer for purposes of
 
 Miranda
 
 .
 

 Furthermore, in its analysis the trial court did not fully apply the correct legal standard with regard to this issue. The court appropriately made findings of fact and conclusions of law on the issue of whether Sergeant Schlegelmilch
 
 *915
 
 acted at the behest of civilian law enforcement officers in questioning Defendant such that she was acting as an agent of those officers. However, the trial court neither acknowledged
 
 Davis
 
 and
 
 Walker
 
 nor analyzed the evidence in light of the legal principles set out therein. Indeed, the Suppression Order bears no indication that the trial court recognized the potential applicability of
 
 Miranda
 
 if Sergeant Schlegelmilch had, in fact, been delegated the authority to arrest Defendant and then proceeded to question him under circumstances amounting to custodial interrogation.
 

 Nor did the trial court make findings about the specific degree to which Defendant's liberty had been restricted at the time he made the 18 August statement to Sergeant Schlegelmilch. As noted above, Sergeant Schlegelmilch testified that at some time during the morning of 18 August 2011, she placed Defendant and Blackett into separate rooms with assigned non-commissioned officers posted in each room as guards to ensure that they did not leave. This restriction on their movements was significantly greater than the restrictions that had been placed on Defendant and Blackett two days earlier, which required them to remain on base and sleep in the same conference room but permitted them to move about the base, complete job assignments, and fulfill other responsibilities under supervision. The trial court's order, however, did not address the change in their confinement or mention the specific types of restrictions to which Defendant was subject at the time he made the 18 August statement to Sergeant Schlegelmilch.
 

 As discussed above,
 
 Miranda
 
 warnings are required only when the defendant is subjected to
 
 custodial
 
 interrogation.
 
 Gaines
 
 ,
 
 345 N.C. at 661
 
 ,
 
 483 S.E.2d at 404
 
 . "A person is in custody for purposes of
 
 Miranda
 
 when it is apparent from the totality of the circumstances that there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."
 

 *485
 

 State v. Garcia
 
 ,
 
 358 N.C. 382
 
 , 396,
 
 597 S.E.2d 724
 
 , 736 (2004) (citation and quotation marks omitted),
 
 cert. denied
 
 ,
 
 543 U.S. 1156
 
 ,
 
 125 S.Ct. 1301
 
 ,
 
 161 L.Ed. 2d 122
 
 (2005). Thus, findings as to the specific manner in which Defendant's freedom of movement had been restrained at the time he was questioned by Sergeant Schlegelmilch are necessary in order to determine whether he was subjected to custodial interrogation.
 

 This Court has explained that "[i]n ruling upon a motion to suppress evidence, the trial court must set forth in the record its findings of fact and conclusions of law. The general rule is that the trial court should make findings of fact to show the bases of its ruling."
 
 State v. McCrary
 
 ,
 
 237 N.C. App. 48
 
 , 51,
 
 764 S.E.2d 477
 
 , 479 (2014) (internal citations, quotation marks, and brackets omitted),
 
 aff'd in part and remanded
 
 ,
 
 368 N.C. 571
 
 ,
 
 780 S.E.2d 554
 
 (2015).
 

 Findings [of fact] and conclusions [of law] are required in order that there may be a meaningful appellate review of the decision on a motion to suppress.
 

 ... [W]hen the trial court fails to make findings of fact sufficient to allow the reviewing court to apply the correct legal standard, it is necessary to remand the case to the trial court. Remand is necessary because it is the trial court that is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the first instance, as to whether or not a constitutional violation of some kind has occurred.
 

 State v. Salinas
 
 ,
 
 366 N.C. 119
 
 , 124,
 
 729 S.E.2d 63
 
 , 66-67 (2012) (internal citations and quotation marks omitted).
 
 See
 

 State v. McKinney
 
 ,
 
 361 N.C. 53
 
 , 63, 65,
 
 637 S.E.2d 868
 
 , 875, 876 (2006) ("We ... should afford the trial court an opportunity to evaluate the validity of [a] warrant using the appropriate legal standard," where the trial court makes only "limited findings of fact," none of which "indicate[ ] whether the trial court would have ... upheld the validity of the warrant" if it had applied the correct legal standard.)
 

 In
 
 McCrary
 
 , the defendant appealed the trial court's denial of his motion to suppress
 
 *916
 
 evidence resulting from a blood test. The trial court made the following factual findings: Deputy Justin Fyle responded to the call of a homeowner after the defendant pulled into the homeowner's driveway and apparently fell asleep in his car. Deputy Fyle arrested the defendant after administering an Alcosensor test yielding results "so high that Deputy Fyle determined that there may be a need for medical attention for the defendant."
 
 *486
 

 McCrary
 
 ,
 
 237 N.C. App. at 49
 
 ,
 
 764 S.E.2d at 478
 
 (quotation marks omitted). The defendant was taken to the hospital at his request, and while there he grew increasingly belligerent and refused to consent to a blood test. Deputy Fyle ultimately collected the defendant's blood without a warrant, approximately three hours after he had responded to the homeowner's call.
 
 Id.
 
 at 50,
 
 764 S.E.2d at 478-79
 
 .
 

 The defendant was convicted of driving while impaired. On appeal, he contended that the results of the warrantless blood test should have been suppressed because the test was unconstitutional based upon the legal standard established in
 
 Missouri v. NcNeely
 
 ,
 
 569 U.S. 141
 
 ,
 
 133 S.Ct. 1552
 
 ,
 
 185 L.Ed.2d 696
 
 (2013), a United States Supreme Court case that had been decided "just over a month after the trial court ruled upon [the defendant's] motion to suppress."
 
 Id.
 
 at 54,
 
 764 S.E.2d at 481
 
 . The defendant did "not challenge the trial court's findings of fact but argue[d] only that his case [was] similar to the situation presented in
 
 Missouri v. McNeely
 
 [.]"
 
 Id
 
 . The defendant "focuse[d] on the lack of findings of fact as to the time that it would have taken Deputy Fyle to obtain a search warrant for the blood test."
 

 Id.
 

 In the defendant's appeal, he noted a number of factual issues that had not been decided by the trial court. We declined to address these issues, explaining, in pertinent part, as follows:
 

 [A]ll of these questions are squarely within the authority of the trial court to make the factual findings as to these issues and to make the appropriate legal conclusions upon those facts. It is the trial court that is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the first instance, as to whether or not a constitutional violation of some kind has occurred.
 

 ....
 

 Defendant is correct that the trial court did not make any specific findings addressing the availability of a magistrate at the time of the incident and the probable delay in seeking a warrant, although Deputy Fyle did testify about this matter, but it seems ... that the trial court considered the time factor in mentioning [that Deputy Fyle had a reasonable belief that there was an exigency based upon the] "additional time and uncertainties in how much additional time would be needed to obtain a search warrant." Without findings of fact on these details, however, we cannot properly review this conclusion. We must therefore remand
 
 *487
 
 this matter to the trial court for additional findings of fact as to the availability of a magistrate and the "additional time and uncertainties" in obtaining a warrant, as well as the "other attendant circumstances" that may support the conclusion of law that exigent circumstances existed.
 

 Id.
 
 at 55-56, 57,
 
 764 S.E.2d at 482, 483
 
 (internal citations and quotation marks omitted).
 

 Thus, because we were unable to properly review the trial court's order, we remanded the case to the trial court for additional findings of fact.
 
 Id.
 
 at 57,
 
 764 S.E.2d at 483
 
 . Our decision was appealed to the Supreme Court.
 
 See
 

 State v. McCrary
 
 ,
 
 368 N.C. 571
 
 ,
 
 780 S.E.2d 554
 
 (2015). In its opinion, the Court stated the following:
 

 [W]e remand to the Court of Appeals with instructions to that court to vacate the portion of the trial court's ... order denying defendant's motion to suppress [the warrantless blood test] and further remand to the trial court for (1) additional findings and conclusions-and, if necessary-a new hearing on whether the totality
 
 *917
 
 of the events underlying defendant's motion to suppress gave rise to exigent circumstances, and (2) thereafter to reconsider, if necessary, the judgments ... entered[.]
 

 Id.
 

 at 571-72
 
 ,
 
 780 S.E.2d at 554
 
 .
 

 Here, the trial court similarly did not make factual findings on several issues that were integral to the question of whether a
 
 Miranda
 
 violation had occurred. Nor - as discussed above - did the trial court fully apply the correct legal standard applicable to this issue. Therefore, we are presently unable to determine whether
 
 Miranda
 
 warnings were required at the time of Defendant's 18 August statement in response to Sergeant Schlegelmilch's questioning.
 

 Because trial courts have "institutional advantages over appellate courts in the application of facts to fact-dependent legal standards," we hold that a determination as to whether Sergeant Schlegelmilch was acting as a law enforcement officer and engaged in custodial interrogation of Defendant under the principles articulated in
 
 Davis
 
 "should, in the first instance, be made by the trial court."
 
 McKinney
 
 , 361 N.C. at 64-65,
 
 637 S.E.2d at 876
 
 (citation and quotation marks omitted). We therefore vacate the portions of the Suppression Order relating to the 18 August oral statement and remand to the trial court for additional findings of fact and conclusions of law along with a new hearing, if necessary, on that issue.
 

 *488
 

 II. 2 September Letter
 

 We reach a different result with regard to the statements contained in the 2 September letter written by Defendant from jail to Sergeant Schlegelmilch. The record reveals that while Defendant was being held in the Harnett County Detention Center following his arrest the decision was made to initiate military discharge proceedings against him. The discharge process began on 25 August 2011. On 31 August 2011, Captain Lett hand-delivered a notice of separation to Defendant. That same day, Defendant signed a memorandum stating, in pertinent part, that he desired to waive his "right to consult with a qualified representative from Trial Defense Services and wish[ed] to continue immediately with the proceedings."
 

 While Defendant was in jail, he exchanged a number of letters with Sergeant Schlegelmilch, several of which were given to law enforcement officers. Sergeant Schlegelmilch wrote a letter to Defendant dated 31 August 2011, which read as follows:
 

 I hope today is a good day for you. I got your computer but can't get it to work [right]. Not sure why. But I will keep trying. Next time you see your lawyer ask him if he can do a power of [attorney] from you for me so I can help take care of your stuff for you and your mom.
 

 I love talking to your mom she is such a great person. She is like my best friend. You are lucky to have her as your mom.
 

 Be careful what you tell the other inmates they aren't the most honest people and they will tell the police in order to help themselves.
 

 I really want to [know] why all this took place will you tell me the real reason this all happened it can't be just over a break in. I am going to try to go to your court date on the 6
 
 th
 
 if I can.
 

 Hope your visit from Cpt. Lett went well. If you have any questions let me [know] and I will get you the answers.
 

 So what do you do to pass the time? I think you should [write] a book about your life I would love to read it. Who [knows] we could get it published.
 

 *489
 
 I have one other question. Why him you [knew] him and worked out together were drugs involved? We got to get you down to at least a murder 2 charge.
 

 Be strong and know we are always thinking about you!!
 

 Becky Schlegelmilch
 

 Defendant replied to Sergeant Schlegelmilch's questions in a letter dated 2 September 2011 in which he gave the following
 
 *918
 
 account of Carlisle's death: After he had witnessed Carlisle in the act of breaking into the 102 Carmichael Drive home, Blackett lured Carlisle back to the residence by telling him that Blackett was interested in buying drugs from him. Upon returning to 102 Carmichael Drive, Carlisle soon realized that he had been induced to return there on false pretenses. He attempted to flee, but Defendant "choked him out and took him to the ground." Blackett then began to beat Carlisle. At that point, Defendant handcuffed Carlisle, questioned him about the robbery, and began beating him when he denied being involved. Once Carlisle finally admitted to having taken part in the break-in, Defendant responded that Carlisle would "get[ ] a second chance" and that they would not report him to the police.
 

 Defendant argues that this letter should have been suppressed because the letter from Sergeant Schlegelmilch asking him to explain how Carlisle had actually died constituted custodial interrogation. We are satisfied, however, that the circumstances under which Defendant's letter was written did not implicate
 
 Miranda
 
 . First, we note that Defendant has failed to cite any caselaw in support of the proposition that questioning conducted through such an exchange of letters can constitute custodial interrogation for purposes of
 
 Miranda
 
 . Nor has our own research revealed any legal authority in support of such an argument.
 

 Furthermore, when Defendant responded to Sergeant Schlegelmilch's letter, he was in the midst of being discharged from the military. While Defendant was not formally removed from Alpha Company until 14 September 2011, the record makes clear that Defendant was aware of the discharge proceedings at the time he responded to Sergeant Schlegelmilch's letter and was not contesting them. In short, these circumstances simply do not amount to the type of coercive environment that
 
 Miranda
 
 was intended to address.
 
 [3]
 

 *490
 

 Conclusion
 

 For the reasons stated above, we (1) affirm the portions of the Suppression Order denying Defendant's motion to suppress the statements made by him to detectives on 16 and 17 August 2011 and in the 2 September 2011 letter to Sergeant Schlegelmilch; (2) vacate the portion of the order denying Defendant's motion to suppress the 18 August 2011 oral statement made to Sergeant Schlegelmilch; and (3) remand for additional findings of fact, conclusions of law, and - if necessary - a new hearing as to whether the 18 August 2011 oral statement was made during custodial interrogation such that
 
 Miranda
 
 warnings were required.
 

 AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH INSTRUCTIONS.
 

 Judge INMAN concurs.
 

 Judge BRYANT concurs in the result only.
 

 [1]
 

 Because his appeal is limited to those two issues, he has waived his right to challenge the trial court's rulings as to the remaining evidence referenced in his motion to suppress.
 

 [2]
 

 We note that under federal law, any enlisted member of the armed forces who "willfully disobeys the lawful order of a ... noncommissioned officer ... shall be punished as a court-martial may direct."
 
 10 U.S.C. § 891
 
 (2012).
 

 [3]
 

 We also observe that the letter from Sergeant Schlegelmilch was not written on official letterhead, was very informal in nature, and was signed "Becky."